Price, Appellant, *v.* Philadelphia Parking
Authority.

318

Argued June 29, 1965; reargued April 19, 1966. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Theodore Voorhees,* with him *Lawrence O. Turner, Jr., Lenard L. Wolffe,* and *Dechert, Price & Rhoads,* for appellants.

*Harry Shapiro,* with him *David N. Bressler,* for appellee.

*Matthew W. Bullock, Jr.,* Deputy City Solicitor, with him *Gerald Gornish,* Assistant City Solicitor, and *Edward G. Bauer, Jr.,* City Solicitor, for Philadelphia, intervenor.

*David Berger, Philip F. Newman* and *William B. Rudenko,* for intervenors.

OPINION BY MR. JUSTICE ROBERTS, June 24, 1966:

In May 1964, appellants, B. Price and Barook Masuda, instituted an action in equity to enjoin appellee, the Philadelphia Parking Authority, from proceeding under separate negotiated agreements for the development of two projects, hereafter referred to as the Academy House Project and the Rittenhouse Square Project, and to have such agreements declared null and void.

The Philadelphia Parking Authority is "a public body corporate and politic, exercising public powers,"[1] created by the City of Philadelphia pursuant to enabling legislation[2] for the purpose of establishing a coordinated system of off-street public parking facilities.[3] Purporting to act under the powers granted by the enabling act, the Authority entered into the challenged projects: the Academy House Project with National Land and Investment Company and the Rittenhouse Square Project with Jack Wolgin and Ephraim Frankel. Due to the nature of the action and the issues presented, it is necessary that we set out the essential terms of the contested agreements.

## I. Academy House Project

The Philadelphia Parking Authority presently operates an open-air facility of a 100 car capacity on the southern half of the block bordered by Broad, Watts, Spruce, and Locust Streets in the City of Philadelphia.[4] National Land and Investment Company is the record owner of the remaining portion of the block, the situs of a vacant structure formerly the John Bartram Hotel.

In the Fall of 1963, National Land and the Parking Authority entered into a negotiated agreement for the development of the Academy House Project.[5] In

---

[1] Parking Authority Law, Act of June 5, 1947, P. L. 458, §5, as amended and supplemented, 53 P.S. §345 (Supp. 1965).

[2] Ibid, §§1-16, as amended and supplemented, 53 P.S. §§341-56.

[3] Ibid, §5, as amended and supplemented, 53 P.S. §345.

[4] The City of Philadelphia is the record owner of the situs of this facility, having purchased the land for $1,000,000, and leases it to the Parking Authority. An ordinance was passed by the City, and approved by the Mayor on December 5, 1962, authorizing the sale of the land to the Parking Authority for $1,100,000.

[5] The agreement was embodied in a "Letter of Intent" from National to the Parking Authority. This letter contained the es-

essential terms, the agreement provided that the Authority was to purchase that portion of the block owned by National and to acquire the remainder from the City of Philadelphia.[6] The Authority further agreed to demolish the existing structure and to finance and construct an eight-story public parking garage on the site. The proposed garage, estimated to cost between $8,000,000 and $9,000,000,[7] was to provide space for approximately 862 automobiles and was to be leased to National for operation as an Authority parking facility. The term of the lease with National for the garage was to be co-terminous with the life of the bonds issued by the Authority to finance land acquisition and construction costs. National, however, was granted an exclusive option to renew the lease "if, and whenever and to the extent that, the life of the Authority is extended . . . ."[8]

In addition to the garage, the Authority also agreed to lease for a like term the air space over the proposed facility to the private developer for the construction of a high-rise apartment complex. The contemplated structure was to consist of two apartment towers rising 22 floors above the garage,[9] containing in excess of

sential terms of the agreement and was approved and accepted by vote of the members of the Authority.

[6] The price to be paid by the Authority to National for the land to be acquired from it has not been determined. The record reveals, however, that $1,500,000 has been suggested by National.

[7] The record reveals that the Chairman of the Parking Authority testified that the cost of building the garage was estimated by the builder and architects to be between $8,000,000 and $9,000,-000. However, it is not indicated whether this estimate included land acquisition and demolition costs. If such amounts are not included, the overall investment in the garage could run well over $10,000,000.

[8] However, the aggregate of the initial lease term and the extension term could not extend beyond the year 2059.

[9] The "Letter of Intent" does not provide for or limit the use to which National may put its air-rights leasehold. The record in-

1000 apartment units. The developer was to be permitted to allocate space on the ground and concourse levels of the garage for its own use or for lease to commercial tenants. This area was to occupy approximately 74,000 square feet and was to be sublet to private commercial tenants for offices, shops, a bank, and a restaurant.[10]

National's financial commitments under the lease agreement called for three separate rental payments: (1) "debt-service rentals" which were to consist of an amount sufficient to meet the amortization and interest on the bonds issued by the Authority to finance the acquisition of the situs and construction of the garage;[11] (2) "Authority rentals" which were to consist of payments for the use of air space over the garage in the following sequence and amounts: $5,000 for the first year of the lease term, $10,000 for the second, $15,000 for the third, $20,000 for the fourth, $25,000 for the fifth and every year thereafter, except for the last 10 years of the lease term, for which the payment was to be $30,000 annually; and (3) "excess rentals" which were to consist of a percentage of the gross receipts over a given amount received by the developer from the operation of the garage and the lease of commercial space therein. Neither the percentage nor the level of gross receipts at which excess rental payments become due is stated in the written agreement or has as yet been fixed by the parties.

Under the agreement, title to the project was to be in the name of the Parking Authority. The developer, however, obtained an exclusive option to acquire the entirety, including the land, garage and apartment

---

dicates that National contemplates the construction here described. Exhibit P. 24, p. 2.

[10] Ibid.

[11] Income produced by the parking garage facility, both from parking and from the lease of commercial space will be available for such rental payments.

structure thereon, at the end of the lease term for an amount based upon *the cost of the garage or its appraised value at the time of purchase.* Thus, no actual payment was to be required for the acquisition by National of title to the structure to be constructed by it over the garage facility.

As an aspect of the lease, the developer agreed to operate the proposed garage "as a public parking facility of the Authority . . . ." The rates and other charges for use of the garage by the public were to be determined by the Authority subject to the proviso that the fees could not be reduced below the amounts initially set without the lessee's consent.

## II. Rittenhouse Square Project

At approximately the same time the negotiations took place between the Authority and National, the Authority also entered into a construction and lease agreement with Jack Wolgin and Ephraim Frankel. The agreement provided for the lease of air rights over a parking facility owned and operated by the Authority at 1815-27 Walnut Street, Philadelphia, Pennsylvania.[12]

Under this agreement, the tenant-developers, Wolgin and Frankel, were empowered to construct a 19 story office building over the Authority's parking garage. The tenants were also to be permitted to "improve and occupy space within the Garage for access to and support of the Office-Building, and ... [to] construct ... [stores] in the basement and on the ground level of the Garage . . ." to be used for their benefit or sublet to other private commercial tenants.[13]

---

[12] The garage at this location had been constructed by the Authority in 1953.

[13] Since the agreement resulted in a reduction of the capacity of the garage, the lessees agreed to add a fifth tier to the existing four tier structure to replace the space diverted.

The tenant-developers, under the agreement, were obliged to pay the Authority for the space within and above the garage a rental averaging approximately $25,000 annually. The term of the lease was to extend for the life of the Authority, including any extension thereof, but was not to exceed 99 years. During the lease term, the parking facilities and improvements thereto made by Wolgin and Frankel, including the office building to be constructed, were to be owned by the Authority. However, the developers were given an exclusive option to purchase the entire project, land, parking facilities, and all improvements, for a sum ranging from $1,000,000 to $1,318,000, exercisable after January 1993, or after the retirement of all outstanding revenue bonds, whichever occurred later.

### III. Grounds of Challenge

In their complaint, Price and Masuda challenge the legality of both projects alleging essentially that the Authority, by employing negotiated agreements rather than competitive bidding, had exceeded its statutory authority; that the Authority was not authorized to engage in the projects because as envisioned they were primarily and predominantly private in nature; and that, as to the Academy House Project, there was no demonstrable present or anticipated future public need for the parking facility proposed.

The Parking Authority filed an answer to the complaint which put the essential facts in issue, and the parties presented testimony. At the start of the trial, at the conclusion of appellants' case, and again when the record was closed, the Authority moved to dismiss on the ground that Price and Masuda lacked standing to challenge the transactions and that they had failed to establish that they were entitled to the relief sought.

Treating the complaint as averring two separate causes of action, the chancellor granted the Authori-

ty's motion to dismiss with respect to the Rittenhouse Square Project on the ground that the complaining parties lacked standing to challenge the transaction. He denied the motion as to the Academy House Project and proceeded to make an adjudication, with findings of fact and conclusions of law.

The chancellor concluded that the Parking Authority, by entering into the Academy House Project without competitive bidding, had not violated the provisions of the enabling act. He further concluded that the project was a public endeavor and that appellants had failed conclusively to establish the lack of public need for the proposed construction.[14] And, although he had previously dismissed that portion of the complaint seeking to enjoin the Rittenhouse Square Project, the chancellor proceeded to make findings of fact and conclusions of law on the merits in order to provide a record in the event that his determination that Price and Masuda lacked standing to challenge it be reversed. On the merits, he concluded that the Authority had not acted contrary to the enabling act.

## IV. Standing to Sue

Price and Masuda are citizens and taxpayers of the City of Philadelphia. In sustaining their standing to challenge the Academy House Project, the chancellor found that Price and Masuda fell within the ambit of the well-defined rule that a taxpayer may challenge the "wrongful expenditures of tax monies and the wasting of assets." *Loewen v. Shapiro,* 389 Pa. 610, 613, 133 A. 2d 525, 527 (1957). Although the Authority is not

---

[14] While the chancellor recognized that appellants had established a prima facie case that no present need existed for the proposed garage, he concluded that the Authority could have reasoned otherwise, both with respect to present and reasonably anticipated future need, and therefore had not acted arbitrarily.

a traditional governmental body, it is created to perform essential public services through the medium of a publicly owned enterprise and is not subject to taxes or assessments upon any property acquired for or devoted to such purposes. Act of June 5, 1947, P. L. 458, §15, as amended, 53 P.S. §355, enacted pursuant to Pa. Const., Art. IX, §1; see *Pittsburgh Public Parking Auth. v. Bd. of Property Assessment,* 377 Pa. 274, 279, 105 A. 2d 165, 166 (1954); *McSorley v. Fitzgerald,* 359 Pa. 264, 267, 59 A. 2d 142, 144 (1948); cf. *Moon Township Appeal,* 387 Pa. 144, 127 A. 2d 361 (1956); *West View Borough Municipal Auth. Appeal,* 381 Pa. 416, 113 A. 2d 307 (1955). Thus, if permitted to proceed, the Academy House Project will presumably result in the removal of a large tract of real estate from the tax rolls because of the location thereon of an Authority parking facility. Cf. *Pittsburgh Public Parking Auth. v. Bd. of Property Assessment,* 377 Pa. 274, 105 A. 2d 165 (1954); *Moon Township Appeal,* 387 Pa. 144, 127 A. 2d 361 (1956). Based upon appellants' allegation that real estate would be illegally exempted thereby, the chancellor reasoned that the project was amenable to challenge by one whose tax burden would be affected. We agree with this conclusion. As the chancellor stated, "to the extent that real estate tax revenues will be diminished by an illegal exemption, and hence be unavailable for future use, . . . [Price and Masuda] as contributors to that fund will have suffered a pecuniary loss."

In *Mayer v. Hemphill,* 411 Pa. 1, 6, 190 A. 2d 444, 446 (1963), this Court reiterated the well-settled rule that a taxpayer may seek to enjoin the wrongful or unlawful expenditure of public funds even though he is unable to establish any injury other than to his interest as a taxpayer. See *Smith v. Gallagher,* 408 Pa. 551, 185 A. 2d 135 (1962); *Scudder v. Smith,* 331 Pa. 165, 200 Atl. 601 (1938); *Harris v. Philadelphia,* 299

Pa. 473, 149 Atl. 722 (1930); *Page v. King*, 285 Pa. 153, 131 Atl. 707 (1926). The court below correctly reasoned that the reduction of the tax base which results from the exemption of property from taxation has, for all practical purposes, the same effect upon the taxpayer as an expenditure of funds. If the latter is challengable by a taxpayer, as has been repeatedly held, so therefore must be the former. Cf. *Bernstein v. Pittsburgh*, 366 Pa. 200, 77 A. 2d 452 (1951).[15]

Proceeding to that portion of the complaint dealing with the Rittenhouse Square proposal, the chancellor concluded that Price and Masuda lacked standing to challenge that project. In distinguishing that transaction from Academy House, the chancellor reasoned that since the Authority presently enjoys a tax exemption on its existing facility, the mere lease of commercial space within and above the building, even if improper, did not threaten appellants with any pecuniary injury. He concluded, therefore, that appellants could not invoke equity jurisdiction to attack the Rittenhouse Square Project. In this, the chancellor erred.

---

[15] Given the ultimate basis of taxpayers' litigation as a means of mobilizing the self-interest of individuals within the body politic to prevent illegal and unwarranted governmental action. Notes, Taxpayers' Suits: A Survey and Summary, 69 Yale L.J. 895, 904-06 (1960), the public interest would not be served by dismissing the instant suit on the ground that the Authority may be denied an exemption for the garage. Cf. *Pittsburgh Public Parking Auth. v. Bd. of Property Assessment*, 377 Pa. 274, 105 A. 2d 165 (1954). The construction presumably will be funded in reliance on the exemption of the garage facility from taxation. Were the exemption to be denied following its completion on the ground that the project was unauthorized and illegal, the security of the bond issue would be threatened and the public interest in the credit of the Authority impaired. It is appropriate, therefore, that the transaction be subject to review at this juncture rather than at some later date under circumstances which may prevent the public interest from being vindicated.

As has previously been noted, under the agreement between the Authority and the developers of the Rittenhouse Square Project, the latter were given an exclusive option to purchase the existing garage facility and land. Thus, the Rittenhouse Square Project involves not merely a lease transaction but also envisions the sale of publicly owned and financed facilities to private developers.

In considering the Authority's claim that the Rittenhouse Square Project is not subject to the instant challenge, it is significant to note that the existence of the Parking Authority is limited to a term of fifty years, subject to the power of the City of Philadelphia to extend its life for an additional like term. Act of June 5, 1947, P. L. 458, §5, as amended, 53 P.S. §345(b)(1). Upon the termination of its existence, the assets of the Authority will pass to the City of Philadelphia. Act of June 5, 1947, P. L. 458, §14, as amended, 53 P.S. §354.[16] Thus, within the foreseeable future, the City of Philadelphia is destined to acquire the assets of the Authority. And, an alleged improper diversion of this property, following its acquisition by the City, would be subject to judicial scrutiny at the behest of a taxpayer.[17] Yet, in the instant case, if Authority property is improperly diverted, Price and Masuda, as citizens and taxpayers of the City of Philadelphia, will sustain a similar pecuniary injury.[18] Under such circumstances, we are led to conclude that Price and Masuda, as representatives of the taxpayers of the

---

[16] Cf. Morris, Evading Debt Limitations with Public Building Authorities: the Costly Subversion of State Constitutions, 68 Yale L.J. 234, 245-46 (1958).

[17] See *Bernstein v. Pittsburgh*, 366 Pa. 200, 77 A. 2d 452 (1951); *Harris v. Philadelphia*, 299 Pa. 473, 149 Atl. 722 (1930); *Wolff Chemical Co. v. Philadelphia*, 217 Pa. 215, 66 Atl. 344 (1907).

[18] Cf. *Bernstein v. Pittsburgh*, 366 Pa. 200, 77 A. 2d 452 (1951); *Harris v. Philadelphia*, 299 Pa. 473, 149 Atl. 722 (1930).

City of Philadelphia, possess the requisite pecuniary interest in the Rittenhouse Square Project to challenge the transaction.

Our conclusion is reinforced by a recognition of the need to subject the activities of public authorities to judicial scrutiny.[19] As public bodies, they exercise public powers and must act strictly within their legislative mandates. Moreover, they stand in a fiduciary relationship to the public which they are created to serve and their conduct must be guided by good faith and sound judgment. See *Schwartz v. Urban Redevelopment Auth.*, 411 Pa. 530, 536, 192 A. 2d 371, 374 (1963); *Heilig Bros. Co. Inc. v. Kohler,* 366 Pa. 72, 77-78, 76 A. 2d 613, 616 (1950). The mushrooming of authorities at all levels of government and the frequent complaint that such bodies act in an arbitrary and capricious manner in violation of existing law dictate that a check rein be kept upon them. *Schwartz v. Urban Redevelopment Auth.,* 411 Pa. 530, 536, 192 A. 2d 371, 374 (1963); *Keystone Raceway Corp. v. State Harness Racing Comm.,* 405 Pa. 1, 5, 173 A. 2d 97, 99 (1961). These considerations dictate that the independence of authorities from some of the usual restrictions on governmental activity[20] not be extended so as to insulate them from judicial scrutiny through the medium of taxpayers' suits.[21]

---

[19] Cf. Davis, "Judicial Control of Administrative Action": A Review, 66 Colum. L. Rev. 635, 659 (1966); Davis, Standing to Challenge Governmental Action, 39 Minn. L. Rev. 353, 391-96 (1955); Jaffe, Standing to Secure Judicial Review: Public Actions, 74 Harv. L. Rev. 1265 (1961).

[20] See Morris, Evading Debt Limitations With Public Building Authorities: the Costly Subversion of State Constitutions, 68 Yale L.J. 234 (1958); Shestack, The Public Authority, 105 U. Pa. L. Rev. 553 (1957).

[21] A taxpayer's suit, as an alternative to reliance on public prosecutions to prevent and redress wrongful conduct, serves an important public interest: "[T]he availability of such litigation is

Having concluded that appellants have standing to seek to enjoin the Rittenhouse Square Project as well as the Academy House Project, we now proceed to a consideration of the merits of their challenge.

## V. Academy House Project

Appellants first urge that the chancellor erred in concluding that the enabling act did not impose upon the Authority the duty to utilize competitive bidding in the leasing of the air rights over the proposed Academy House construction. While we are in agreement with the chancellor's conclusion that the Authority was free to negotiate the lease of the proposed garage facility,[22] we do not agree that it was free to dispense with competitive bidding in the leasing of air rights.

The enabling act grants the Authority broad general powers to operate, own, and lease—both as lessee or lessor—facilities in the fulfillment of its statutory purpose of providing public off-street parking. Act of June 5, 1947, P. L. 458, §5, as amended, 53 P.S. §345(a) (Supp. 1965). In order to assist in defraying its expenses, the Authority is also empowered by the enabling act "to lease portions of the street level or other floors of . . . parking facilities for commercial use . . . ." Ibid. However, leases of such commercial space within Authority facilities are subject to

insurance against the instances in which the responsible prosecutors, usually political officers, are themselves allied with the action challenged or are overly burdened to identify and rectify every . . . illegal practice." Notes, Taxpayers' Suits: A Survey and Summary, 69 Yale L.J. 895, 911 (1960) ; see also Jaffe, Standing to Secure Judicial Review: Public Actions, 74 Harv. L. Rev. 1265, 1280, 1282 (1961).

[22] See *Seligsohn v. Philadelphia Parking Auth.*, 412 Pa. 372, 194 A. 2d 606 (1963) ; *Clark v. Public Parking Auth.*, 372 Pa. 481, 94 A. 2d 576 (1953).

the explicit statutory requirement that they be entered into "on a fair competitive basis." Ibid.[23] Thus, the enabling act distinguishes between the leasing of facilities for operation as an Authority parking garage and the leasing of commercial space for incidental, revenue producing purposes, explicitly mandating that the latter commercial leases be granted only on the basis of competitive bidding. Ibid.

In 1961, the Legislature added the following proviso to §5 of the Act: "Nothing herein contained shall be construed to prohibit the sale or leasing by the Authority of the right to occupy and use the space above any parking facilities for commercial uses other than parking . . . ." Act of June 5, 1947, P. L. 458, as amended, Act of September 2, 1961, P. L. 1229, §1, 53 P.S. §345(a) (Supp. 1965). This amendment merely granted the Authority the power to lease air space for non-parking commercial uses just as the Act had previously authorized the Authority "to lease portions of the street level or other floors of . . . parking facilities for commercial use . . . ." It is clear, therefore, that the power to lease air rights is an aspect of the Authority's power to lease non-parking commercial space and only incidental to its primary purpose of providing parking facilities for the general public.

---

[23] We deem the statutory phrase "on a fair competitive basis" to impose the requirement of competitive bidding, since any other construction would render the direction meaningless. See *Whitemarsh Twp. Auth. v. Elwert*, 413 Pa. 329, 196 A. 2d 843 (1964); *Commonwealth v. Sitkin's Junk Co.*, 412 Pa. 132, 194 A. 2d 199 (1963); *Daly v. Hemphill*, 411 Pa. 263, 191 A. 2d 835 (1963). The Authority has the inherent duty to act to advance the public interest. This duty would necessarily dictate that leases be entered into in a fair, open and reasonable manner. We must conclude therefore that the Legislature, by its explicit statutory direction, intended that the Authority utilize competitive bidding in entering into such leases.

This Court has previously expressed the policies underlying the requirement of competitive bidding, noting that the resulting competition guards against favoritism, improvidence, fraud, and corruption in the awarding of public contracts. *Yohe v. Lower Burrell,* 418 Pa. 23, 28, 208 A. 2d 847, 850 (1965); *Corcoran v. Philadelphia,* 363 Pa. 606, 609, 70 A. 2d 621, 623 (1950); see also 10 McQuillin, Municipal Corporations §29.29 (3d ed. 1950). Giving recognition to these policies, the Legislature explicitly mandated the use of competitive bidding both with respect to the leasing of non-parking commercial space [24] and the letting of construction and repair contracts.[25]

The language of the 1961 Amendment to the Act providing for the leasing of air space neither specifically nor impliedly exempts such leases from the requirement of competitive bidding. Nothing there contained suggests an intent on the part of the Legislature to alter its policy of requiring competitive bidding in the leasing of commercial space so as to exclude the leasing of air rights from the requirement of such bidding and to deny the public the protection thereby afforded. Absent a clear expression of such an intent, we are compelled to conclude that such leases are subject to the same requirement as all non-parking commercial leases, that they be granted "on a fair competitive basis."[26]

---

[24] Act of June 5, 1947, P. L. 458, §5, as amended, 53 P.S. §345(a) (Supp. 1965).

[25] Ibid, §11, as amended, 53 P.S. §351 (Supp. 1965).

[26] Our conclusion that the duty to employ competitive bidding is imposed by the Act is reinforced by a consideration peculiar to air right leaseholds. Due to their recent advent, standards by which such leaseholds may be valued have not yet evolved. By requiring competitive bidding, the Legislature has established a method by which the "market-place" will operate to ensure that such leases are not entered into in an arbitrary and capricious manner, whether by reason of favoritism or good faith mistakes in valuation.

We hold, therefore, that the agreement between the Parking Authority and National for the lease of air rights over the Academy House Project, entered into by private negotiation rather than by competitive bidding, was unauthorized and void. Accordingly, Price and Masuda were entitled to the relief which they sought below and the action of the chancellor in dismissing their complaint must be reversed.

However, in light of the importance of the public issues raised by the challenged transaction, we find it appropriate to discuss another aspect of the litigation which also mandates reversal of the court below.

Price and Masuda attacked the Academy House Project not only on the ground that it was entered into without competitive bidding but also on the ground that any benefit to be derived therefrom would be predominantly private, not public in nature and that the project was therefore beyond the scope of the powers statutorily conferred upon the Authority. Our consideration of the transaction in its entirety leads us to conclude that they must prevail on this ground as well.

The Parking Authority, as a public corporation, exercises public powers. Act of June 5, 1947, P. L. 458, §5, as amended, 53 P.S. §345 (Supp. 1965). Its engagements are public in nature, and its facilities, whether operated by the Authority or leased to private parties, are public property. See *Pittsburgh Public Parking Auth. Petition*, 366 Pa. 10, 76 A. 2d 620 (1950). Empowered to act only for the public benefit, the Authority may not employ its resources for the primary and paramount benefit of a private endeavor. An engagement essentially private in nature may not be justified on the theory that the public will be incidentally benefited.

In determining whether the instant project is essentially public or private in nature, we are confront-

ed with an issue analogous to that frequently presented in eminent domain proceedings. We have said in that context that such power may not be employed for the purpose of devoting the property so acquired for merely private benefit. See *Belovsky v. Redevelopment Auth. of Philadelphia*, 357 Pa. 329, 340, 54 A. 2d 277, 282 (1947). Although there may be an incidental benefit to private parties without invalidating the taking, the power of eminent domain may not be employed unless the public is to be the primary and paramount beneficiary of its exercise. Ibid. And while we do not deal here with eminent domain, we are confronted with the purported exercise of powers statutorily subject to the same limitation.[27] The Parking Authority Law confers no power on the Authority to act other than for the public benefit in providing off-street parking facilities. Accordingly, the Academy House Project may not be permitted to proceed unless as presently envisioned it will result predominantly in public benefit through the creation of additional off-street public parking facilities commensurate with the public investment in the project.

In considering the validity of the agreement between the Authority and National, we examine first the benefits to be derived by the private developer from the Academy House Project. Under the agreement, the Parking Authority will purchase land from the developer for the situs of the project, demolish the existing structure, and construct the garage thereon. National will lease and operate the garage and also construct

---

[27] Cf. *City & County of San Francisco v. Ross*, 44 Cal. 2d 52, 279 P. 2d 529 (1955) ; *Denihan Enterprises v. O'Dwyer*, 302 N.Y. 451, 100 N.Y.S. 2d 512, 99 N.E. 2d 235 (1951) ; *McClelland v. Mayor and Council of Wilmington*, 159 A. 2d 596 (Del. 1960) ; *Wilmington Parking Auth. v. Ranken*, 105 A. 2d 614 (Del. 1954) ; Note, State Constitutional Limitations on the Power of Eminent Domain, 77 Harv. L. Rev. 717, 724-25 (1964).

and operate thereover a high-rise apartment building containing in excess of 1000 units. The developer will also be permitted to devote substantial portions—approximately 74,000 square feet—of the ground and basement levels of the garage to its own purposes and to sublet other portions to private commercial enterprises. In addition, National will have an exclusive option to acquire the land and public garage.

By what is essentially a sale and lease-back arrangement, National will be able to finance its site costs through the medium of long term public financing, with all the benefits which attend such an arrangement, not generally available to other private commercial developers. Moreover, were National to embark on the proposed apartment construction absent reliance on Authority provided parking, it would be required to make provision for its tenants to the extent of approximately 500 car spaces in order to comply with the Philadelphia Zoning Code.[28] By advantaging itself of the Authority's commitment to construct and to lease a public parking facility to it, National is able to avoid the initial investment required to comply with the requisite zoning provisions. And by the use of its exclusive option to acquire the garage facility in the future, National is able to defer such major capital investment to a much later date and to accumulate revenues generated by the parking facility and the concourse and ground level commercial rentals for the cost of acquisition.[29]

To this extent, the Academy House Project involves substantial public financing of a private endeavor. Ir-

---

[28] Phila. Zoning Code §§14-1402(2) (a) (.1), 14-1403.

[29] Even though National agrees to pay for the garage facility upon the exercise of its option, its ability to defer any capital investment in the facility to some date years in the future supports the characterization of the transaction as one involving public financing.

respective of any benefit that the public may ultimately derive, it cannot be denied that a significant ingredient of the transaction is the use of the Parking Authority as a conduit by which a private developer is able to lighten substantial burdens, both economic and regulatory, which would otherwise devolve upon it.[30] There is therefore presented on this record a substantial degree of public involvement and investment in a private profit making venture, not only with respect to the operation of the garage facility itself, but in the overall commercial aspects of the complex as well. And although certain such benefits may necessarily flow from the Authority's power to lease air rights, whether a particular project is within the ambit of the enabling act is dependent upon the public being accorded benefits sufficiently substantial in nature as to justify the Authority's involvement in the endeavor. Hence, the totality of private benefit accruing to National must be considered in determining whether the project as proposed reflects the required predominant public benefit.[31] In

[30] It should also be noted that were National to embark upon the Academy House Project without the benefit of the Authority parking facility, its real estate taxes would be significantly higher. The garage which it would be required to construct in order to comply with zoning requirements would not be exempt from realty taxes. The potential savings under the challenged arrangement may be illustrated as follows: Assuming an $8,000,000 facility, a 69.6% assessment, see *Schenley Land Co. v. Allegheny County Bd. of Property Assessment*, 205 Pa. Superior Ct. 577, 581, n.1, 211 A. 2d 79, 82, n.1 (1965), would produce $5,568,000 of taxable realty aside from land. When taxed at the current Philadelphia rate of $4.37 per $100 of valuation, the annual tax on the garage would be $243,321.60. Assuming for purposes of illustration a constant assessment and tax rate, the potential savings when projected over a thirty year period would rise to $7,299,648, an amount approximating the initial cost of the facility. Any increase or decrease in the market value of the facility, the assessment, or the tax rate would, of course, affect the actual result.

[31] Other provisions obtained by the private developer which must be considered in determining whether the project as envi-

the instant case, in the face of the numerous and substantial benefits accruing to the private developer from the Academy House Project, the record fails to disclose any benefit to the public of more than a limited and incidental nature.

The parking facility presently operated by the Authority at the situs of the project has a capacity of 100 cars. The proposed garage will have a capacity of approximately 862 cars. The chancellor made a finding that the Academy House apartment development would require 356 car spaces for residential tenants and 80 car spaces for commercial tenants, a total of 436 spaces. He concluded that the proposed project would provide an excess of 426 spaces for the public and an increment of 326 spaces over that presently available at the Authority's open air facility.

In arriving at his conclusion that the apartment complex would only generate a daily demand for 436 car spaces, the chancellor relied upon a report prepared for National in September 1963 by Wilbur Smith and Associates, traffic consultants. However, although the Smith Report repeatedly discusses the parking demand to be generated by guests and business visitors to apartment residents, its conclusion that the Academy House apartment development would only utilize 356 car spaces fails to account for this demand. It is obvious that an apartment house of the size con-

sioned embodies a permissible balance of public and private benefit include: the inability of the Authority to reduce rates below that initially set without the consent of National; the exclusive options obtained by National to renew its lease and to purchase the garage facility; and the absence of any provision in the written agreement for the posting of a performance bond or security deposit. It should be noted that by reason of the lease and option provisions, the Authority has, in practical effect, created a limited and private market for the lease and sale of the garage facility by establishing National as the sole and exclusive operator and potential purchaser.

templated will, as the Smith Report indicated, generate a significant demand beyond that created by the tenants themselves. The failure of the Smith Report to include such demand in its projection of the space to be required by the apartment development renders that report of limited utility. Under such circumstances, reliance on the Smith data that the Academy House complex will require only 436 car spaces was unjustified and unreasonable.[32]

In the absence of another, more reliable index of demand, we think the appropriate reference for projection should have been the requirements of the zoning code. Under the code, as previously noted, a minimum of 500 car spaces would have been required. Taking into account the 80 spaces found by the Smith Report to be required by the commercial tenants, it could reasonably be anticipated that a total demand for 580 spaces will be generated by the Academy House Project. Since, however, the Parking Authority presently provides 100 car spaces on its open-air facility, the situs of which will be taken up by the complex, the net gain to the public upon the completion of the project will be approximately 180 car spaces.

This net increment to the public, in light of the magnitude of the garage project and the substantial benefits accruing to public therefrom, is not sufficient to warrant the public involvement here proposed. In weighing the benefits to the respective parties, the record compels the conclusion that the Academy House Project, as envisioned, results in the subordination of the public interest to that of a private developer.

---

[32] Another limitation of the specific report which the chancellor relied upon in concluding that the Academy House apartment complex would only require 436 car spaces was the failure of the report to indicate the data or criteria upon which its projections were based.

In the face of the limited and, to a great extent, conjectural gain in the number of parking spaces which will be made available to the general public by the Academy House Project, the private developer is assured of very substantial and significant benefits. As a result of the Authority's engagement in the project, National will be the beneficiary of a large scale public investment in a garage facility to be utilized primarily by its own tenants.

The enabling act does not contemplate that the resources of the Parking Authority shall be employed to secure to private activities the means to carry on a private enterprise whose primary objective and purpose is private gain and not the satisfaction of public need. Cf. *City & County of San Francisco v. Ross,* 44 Cal. 2d 53, 60, 279 P. 2d 529, 533 (1955). In weighing the relative benefits to be accrued, we are compelled to conclude that the facility contemplated in the present case appears to be narrowed to such an enterprise. Cf. ibid. The totality of these circumstances leads us to conclude that the public is not the primary and paramount beneficiary of the Academy House Project. In the absence of such prospective public benefit, neither the public participation nor the grant of governmental benefits to private parties here proposed may be permitted.[33]

In reaching this conclusion we are not unmindful of the suggestion which has been advanced that the Academy House Project represents a contribution to the development of center-city Philadelphia. However, the Authority is limited by the enabling act to engagements which will result in the fulfillment of its statutory mandate of providing off-street *public* parking. Such assistance to a private developer as is here con-

---

[33] Cf. Note, State Constitutional Limitations on the Power of Eminent Domain, 77 Harv. L. Rev. 717, 724-25 (1964).

templated is beyond the scope of the Authority's statutory powers.

Moreover, a careful consideration of the effect of the Authority's participation in the instant project casts grave doubt on its ultimate contribution to center-city renewal. By reason of the Authority's involvement in this venture, National will be placed at a competitive advantage over existing comparable facilities privately financed and properly taxed. But more importantly, the competitive advantages accorded National as a result of the Authority's participation will have the effect of discouraging wholly private investment in similar center-city development. To permit the instant project to proceed would establish an unwise and dangerous precedent under which all such future development would require and seek similar Parking Authority assistance in order to equalize the advantages accorded National. Furthermore, under such precedent the Authority could employ its other public powers, including the power of eminent domain,[34] for the primary benefit of private developers.

For the reasons heretofore stated, we hold that the Parking Authority may not cloak a private interest, as is here proposed, with benefits so grossly disproportionate to the benefits accorded the public. The challenged agreement, therefore, was beyond the Authority's power and appellants were entitled to injunctive relief.[35]

---

[34] Act of June 5, 1947, P. L. 458, §5, as amended, 53 P.S. §345 (b) (12).

[35] In light of the disposition we make, we find it unnecessary to reach the issue of whether the Authority had acted unreasonably in concluding that present and anticipated future public need in the locale of the proposed garage facility were sufficient to warrant its construction. Assuming arguendo the existence of such need, the Authority may not propose to meet it through the medium of a project which results in an overwhelming and predominate benefit to private developers.

## VI. Rittenhouse Square Project

In light of our previous conclusion that the Parking Authority is not free to lease air rights by private negotiation, we are compelled to conclude that the chancellor erred in denying appellants injunctive relief with respect to the Rittenhouse Square Project as well. Our conclusion that this project must be enjoined because of the Parking Authority's failure to comply with the competitive bidding requirements of the enabling act is reinforced by a consideration of certain aspects of this transaction not present in the Academy House Project.

Under the terms of their agreement with the Authority, the developers of the Rittenhouse Square Project were authorized to "construct, lease and maintain certain commercial areas . . . in the basement and on the ground level of the Garage [sic] along the Walnut Street frontage thereof . . . ." Accordingly, the negotiations between the parties envisioned not only the lease of air space, but also the lease of commercial space *within* the garage facility. As to the lease of the latter, no possible construction of the enabling act would remove the obligation of the Authority to proceed by competitive bidding, since the Act specifically requires that the leasing of such commercial space be done only "on a fair competitive basis." Act of June 5, 1947, P. L. 458, §5, as amended, 53 P.S. §345(a) (Supp. 1965). This statutory mandate having been disregarded, the agreement between the Authority and Wolgin and Frankel was beyond the scope of the Authority's powers and thus invalid.[36]

---

[36] We take note of the fact that the Parking Authority, in acquiring the site for the Rittenhouse Square parking facility, agreed to a restriction which prohibits construction higher than 70 feet above ground level. It has been suggested that the private developers, Wolgin and Frankel, control that restriction and, as a result, are the only parties with whom the Authority could nego-

Accordingly, the decree of the court below dismissing the complaint must be reversed and the record remanded for further proceedings consistent herewith. Costs upon appellee.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Philadelphia Parking Authority, like all parking authorities, is empowered to erect public garages. As a matter of convenience and practicability a garage can rise only to a certain height which means that the space above that maximum altitude ordinarily remains unused. In 1961, the Pennsylvania Legislature realizing that this non-use amounted to a waste of construction area, amended the Parking Authority Law of 1947 to provide: "Nothing herein contained shall be construed to prohibit the sale or leasing by the Authority of the right to occupy and use the space above any parking facility for commercial uses other than parking (except the sale of gasoline or the sale of automobile accessories), together with the right to use and occupy such space within the parking facility as may be necessary for the purposes of access to and support of structures occupying the space above such parking facility." (Amended 1961, 53 P.S. §345).

---

tiate respecting the air rights over the facility. This contention does not merit serious consideration and may be disposed of without reaching the issue of the propriety of the Authority's action in binding itself in this manner. The Authority, as a public body, is specifically empowered by the enabling act to use eminent domain in the furtherance of its public purpose. Act of June 5, 1947, P. L. 458, as amended, 53 P.S. 345(b)(12). Thus, so long as the Authority is acting within its statutory powers, the deed restriction is no more an impediment to further development of the Rittenhouse Square facility than the presence of the John Bartram Hotel is an impediment to the development of the Academy House project. In both instances, the Authority is empowered to acquire by eminent domain any private interest which inhibits the exercise of its public purpose.

In 1952 the Philadelphia Parking Authority had constructed near the corner of 19th and Walnut Streets, Philadelphia, a garage, which, since it faced Rittenhouse Square, has become known as the Rittenhouse Square Garage. Next to this garage, on its west side, rises the Wellington Apartment Building, whose owners, for the purpose of being assured of continuing light and air, possess a deed restriction which prevents the Rittenhouse Garage from climbing to a height above 70 feet.

At the time the Parking Authority erected the Rittenhouse Garage, it built also a garage at 10th and Ludlow Streets which, it developed later, was not a very profitable venture. I do not believe it necessary to enter into any extended discussion of the financial situation which impelled the Parking Authority to consider a project which would add to the height of the Rittenhouse Garage property. It is enough to say that the Authority felt it had an obligation and need to enhance its financial prestige in the private bond market in order to perform its undertaken tasks. The Authority is totally financed by private funds raised through the sale of bonds to private persons. This Court said in *Seligsohn v. Phila. Parking Auth.*, 412 Pa. 372, that a public parking authority is required to establish facilities which will sustain revenue bonds so that it will be financially independent of the government.

Accordingly, the Authority entered into negotiations with the owners of the Wellington Apartments to lease to them the air rights above the garage in return for which extensive and valuable benefits will accrue to the Authority. Briefly those benefits will include the following:

1. The lessees will erect at their sole cost and expense, according to plans approved by Authority, a modern multi-story office building over the Rittenhouse Garage, improving the Walnut Street frontage with an

attractive lobby entrance and fashionable stores. Should there be default not cured by lessees or their mortgagees, the Authority will fall heir to this valuable improvement without a single penny of investment.

2. The lessees, at their expense and in accordance with plans approved by the Authority, will replace each parking space taken by the building construction by adding another level of parking to the existing garage facility, beautifying the existing facade of the entire garage with a modern screen facade, all of which improvements will be given over to the Authority without charge.

3. The lessees will relinquish, without charge, their valuable right to control the air space above the Rittenhouse Garage.

4. All costs of occupancy, including insurance, repairs, maintenance and compliance with municipal regulations, will be borne by the lessees at their sole cost and expense.

5. The lessees will save the Authority harmless from any loss of gross operating revenues and/or rentals from a particular tenant incurred by the Parking Authority during the construction period because of construction operations, and will post a bond in the amount of $50,000 to guarantee such reimbursement.

6. The lessees will pay an aggregate annual rental of $27,300 for the term of the lease.

7. The lessees will pay in full any and all forms of annual real estate and personal property taxes, assessments, water and sewer rentals and similar governmental charges levied or assessed against the demised premises.

8. Since the construction cost for the office building will be $10,000,000, this will of course give rise to a considerable tax rateable to the City of Philadelphia as well as a significant expense to the lessees. The demised premises will be subject to taxation by the City

of Philadelphia and will not be relieved because of the basic tax exemption to the Parking Authority for facilities used by it.

An improvement of this magnitude can, of course, solely be productive of enormous benefits to the city in almost every phase of economics. It will also add immeasurably to the beauty of the area involved. It is statutorily authorized.

How then can there possibly be any valid objection in law, utility and justice to so wholesome an enterprise, so beneficial to the city government, so advantageous to the motoring public, so helpful to the community, and of such stimulating effect to the whole building program of the city?

The Majority Opinion does not show or even contend that the projected improvement can produce any result other than a beneficial one to Philadelphia. It only says that the agreement between the Authority and the lessees is invalid because the negotiations between the parties should have been conducted on a competitive bidding basis. But what was there to bid about? The lessees were the only parties that controlled the space above the garage, since the deed restriction guaranteed them non-construction higher than 70 feet above the ground. Thus no one could acquire the right to build above the Rittenhouse Garage except through the owners of the Wellington Apartments.

Does the Parking Authority Act of 1947 offer any barrier to the negotiations between the Authority and the builders of the office structure here contemplated? Not at all. Section 11 of the Parking Authority Law, 53 P.S. §351 provides that: "all construction . . . by any Authority, where the entire cost . . . shall exceed $1000 . . . shall be done only under contract or contracts to be entered into by the Authority with the lowest responsible bidder, upon proper terms after due

public notice has been given asking for competitive bids . . ."

It is clear here that the only requirement of competitive bidding is where the construction done *by the Authority* exceeds in cost $1000. But here the Authority is not doing any construction whatsoever. Not only that, the entire cost of the Rittenhouse Square project, estimated at $10,000,000 is to be borne exclusively by the lessees. The Legislature did not even require that the leasing of the air space should be on a "fair competitive basis."

The word "competitive" appears once again, and only once again, in the Parking Authority Act, in §5 where the statement is made that the leasing of "portions of the street level or other floors of the parking facilities for commercial use . . . shall be granted on a fair competitive basis."

It will be noted here that the phrase "fair competitive basis" is used in an illustrative sense, and not in a scientifically restrictive sense. The thought behind the language is to explain how street level and lower floor leases shall be granted—on a fair competitive basis, that is to say, all prospective lessees shall be treated alike. There is no requirement that there must be actual bidding where the street level and lower floor levels are involved, and all this comes within the sound administrative discretion of the Parking Authority.

But it cannot be emphasized enough, in the interests of fair legal interpretation, to say nothing of elementary justice, that there is nothing in the Parking Authority Law which inhibits the Parking Authority from entering into direct negotiations with the owners of the adjacent Wellington Apartments, since there was no one else to negotiate with, the Wellington owners being the only persons who could acquire the full rights, because of the deed restrictions already mentioned, to build over the Rittenhouse Square Garage.

And then one cannot overlook the common sense observation that there are situations, peculiar in themselves, where bidding is not only superfluous but wholly valueless. The *Silsby Mfg. Co. v. Allentown* case, 153 Pa. 319 is in point. There, the City of Allentown entered into a contract for the purchase of a patent flue for use in a fire engine built by the Silsby Manufacturing Co. The City resisted liability, asserting the article was purchased by direct negotiation without resort to competitive bidding. Our Court held that under those circumstances, competitive bidding was not necessary: "The flues were made only by the plaintiff. They could be bought nowhere else. Competition under such circumstances are impossible. Ratio cessante cessit lex. The law does not insist on what is impossible, or absolutely useless."

Obviously, it would have been useless to advertise for bids for the leasing of the air space definitely *controlled* by the adjacent apartment building owners and definitely *not* controlled by the Parking Authority. To require the procedure of public competitive building under such circumstances would be an exercise in futility. The law does not demand the doing of a vain thing.[1]

Thus, no matter what may be said about the Academy House project which is also involved in this litigation, it is as clear as language can make it, that the Rittenhouse Square project comes squarely within the law, and it could only be through arbitrary judgment or caprice to strike down this splendid project which will redound to the best welfare of the City from every possible angle viewed.

---

[1] *Potts v. Utica*, 86 F. 2d 616 (2d Cir. 1936) ; *Alexander v. Natchez*, 219 Miss. 78, 68 So. 2d 434 (1953) ; *O'Brien v. Niagara Falls*, 65 Misc. 92, 119 N.Y.S. 497 (1909) ; *Hordin v. Cleveland*, 77 Ohio App. 491, 62 N.E. 2d 889 (1945) ; *Worthington v. Boston*, 152 U.S. 695, 38 L. ed. 603 (1894) ; et cetera, without number.

To deny the Rittenhouse project would mean that the extremely valuable space above the Rittenhouse Square could never be utilized because if it cannot be used by Wellington, no one else will have any right to use it. To destroy the utilization of property rights in this fashion cannot be a way in which to increase respect for law or for the courts.

Indeed even able counsel for appellants, at the oral argument before this Court, conceded that the appellants had no case against Rittenhouse Square Project. He admitted that unless the Parking Authority Act as amended in 1961 should be declared unconstitutional or otherwise be nullified by this Court (and he stated no grounds for such nullification) the Rittenhouse Square project must be upheld by this Court.

It is not contended here that the Parking Authority acted in bad faith or arbitrarily. It is not even asserted that the Authority abused its discretion. In *Schwartz v. Urban Redev. A. of Pgh.*, 416 Pa. 503, this Court, speaking through Justice O'BRIEN, said: "We cannot and will not substitute our judgment of what is a sound economic and social redevelopment of the subject project for that of the Authority, the Authority's judgment having been based on a proper exercise of the discretion vested in it by law."

What is a sound economic development of the air space which the Legislature has authorized and empowered the Parking Authority to lease for commercial purposes, is a matter for the sound discretion of the Authority—not the Courts.

The fact that the lessee will have the option to purchase (a provision customarily a part of long-term leases), can not justify an injunction to restrain the construction of the superstructure pursuant to the lease. The option in question is not even exercisable until sometime between 1993 and 2003. And, *more important than anything else, that option may not be*

*exercised until every single penny of the bonds issued to construct not only the garage at Rittenhouse Square but the one at 10th and Ludlow Streets as well will have been paid in full.* The option price indicated was sustained by two separate independent appraisals.

The record overwhelmingly supports the finding of the learned chancellor in the court below and affirmed by the court en banc, that the lease in its entirety was within the sound discretion of the Parking Authority. To strike down this legitimate wholesome project would be to tediously roll a boulder in the path of construction progress, it would be to throw a monkey wrench in the machinery of urban development, it would be to spread a pall of discouragement over municipal, traffic and economic planners wrestling with the distressing problem of adequate parking in the city.

I do not think this Court should do this. The Legislature has, through the amendment of 1961, placed its blessings on projects of this specific character; the law authorizes this particular project; good, sound common sense recommends it; progress demands it. Since this Court has found nothing to displace the findings of the court below, since it cannot show that the Authority abused its discretion, the decision of the court on the Rittenhouse Square Project should absolutely be affirmed.

## I

### Academy House Project

The bulk of the Majority Opinion is devoted to an analysis of the Academy House Project. There is no need to reiterate the basic elements of the challenged transactions entered into by the Philadelphia Parking Authority and National Land and Investment Company since they are fully detailed in the Majority Opin-

ion. But it is necessary to put those facts into proper perspective and to analyze the appellants' contention that this transaction is in violation of law.

The Academy House project involves the construction of a seven story public parking garage and the building of a high rise apartment house above it.

A summary of the essential terms of the Academy House transaction is clearly and succinctly set forth by the learned chancellor in his findings of fact which have been affirmed by the court en banc. No one even contends that the court below lacked evidence to support these findings of fact. Hence they are conclusive. Briefly the more essential ones state that:

"(4) The site of the project is the block in center City Philadelphia bounded by Watts, Spruce, Broad, and Locust Streets. The southern part of this block is owned by the City and is leased to the Parking Authority, which operates it as an open-air parking lot. The northern part (the balance) is owned by National Land & Investment Co., a Pennsylvania corporation with its principal office in Philadelphia, and is the site of the John Bartram Hotel (now boarded up).

"(5) On October 31, 1963, the National Land & Investment Co. wrote a letter of intent to the Parking Authority, which the Authority accepted at its meeting of December 11, 1963.

"(6) The project as outlined in the letter of intent provides that the Parking Authority will acquire the block bounded by Watts, Spruce, Broad, and Locust Streets, and after having the John Bartram Hotel demolished, will have built a garage of about seven stories, with about 850 parking spaces, which will cover the block. To finance the cost of these steps the Authority will issue long term revenue bonds, secured by revenues to be received by the Authority from activities in the project. The Authority will then lease the

garage to National Land & Investment Co. The lease will allow National to occupy and use the air space above the garage. National Land will operate the garage as a public parking garage, and will sublet portions of the first floor and basement for commercial use on a fair competitive basis, all in accordance with the Parking Authority Law and the Authority's rules and regulations. In the air space above the garage, National Land will construct, maintain, and operate at its expense, a high-rise apartment building of one or two towers and with about 1,000 apartments. As rent for the garage and the air space above it, National Land will pay the Parking Authority an amount that will include the principal and interest on the bonds issued by the Authority to finance the erection of the garage, and the term of National Land's lease of the garage and air space will be coordinated with the life of these bonds.

"(9)   Although not mentioned in the letter of intent, the plan is that the cost of building the garage will be determined by competitive bids to be received by the Authority.

"(10)   . . . it is contemplated that at the expiration of National Land's lease, the Authority will have the option to buy, at a price not yet agreed upon, the land and all improvements on it, including the apartment building."

In Exhibit P-22 (860a), the rentals which National is required to pay are explicitly set forth as follows:

"3.   National shall pay as rentals during the initial term of the lease, the aggregate of (a) 'debt service rentals' which shall be an amount sufficient to pay in full the principal and interest on the bonds, less capitalized interest; (b) authority rentals which shall be $5000 for the first year, $10,000 for the second, $15,000 for the third, $20,000 for the fourth, $25,000 for the fifth and every year thereafter, except for the last ten

years for each of which it shall be $30,000 and (c) 'excess rentals' which shall be a percentage to be agreed upon of the excess of the aggregate for each year of the gross receipts from parking operations within the Project and the rentals received by National for the occupancy of said commercial space, over an amount to be agreed upon.

"4. National shall pay as rentals during any extension term of the lease, the aggregate of (a) said 'excess rentals', and (b) 'extension rentals', which shall be annually an amount equal to five (5%) per cent of the purchase price and all other costs paid or incurred by the Authority in acquiring and clearing all of the land hereinbefore referred to, or five (5%) per cent of the appraisal of the land within the Project, whichever is greater." (p. 861a)

A more specific, salutary agreement, conducive to the best interests of the City of Philadelphia, in keeping with the spirit of the times, and destined to greatly benefit the motoring public, it would be difficult to find. It must be stated at the very outset that the cost of the public parking facility portion of the Academy House Project will be financed entirely by the Authority's revenue bonds. In turn, the lessee (National Land) will pay as part of the rent all sums necessary to meet the principal and interest on those bonds. Here again, and this must be emphasized, *not a single penny of public funds will be expended.* Here indeed, manna will be descending from the top of the skyscraper apartment house to an Authority, whose pantry needs replenishment. The lessees will pay for every expense required for the construction of the building. What does the Authority give in return? The empty air above the garage. Could there ever be a more fruitful return than oranges falling from invisible trees growing above the top of one's own back yard?

I repeat, no governmental funds from any source, federal, state, or city, will be expended on the Academy House Project.

The public parking facility of the Project will be operated as a public parking facility in accordance with the Public Parking Law so that it will be available to all members of the public regardless as to whether or not they are tenants of the apartment house.

The Philadelphia Parking Authority is in dire need of this project. The chancellor found in his 45th finding of fact, which was based on ample evidence in the record and also affirmed by the court en banc, that: "The Parking Authority must operate on the basis of its structures being self-supporting, and it receives no subsidy (such as, for example, a portion of revenues from parking meters) to assist it in meeting its expenses. Accordingly, *experience has shown that its bonds are not readily salable unless secured by revenue in addition to that received from a garage. In this case, as stated above in the findings on the Proposed Project, such additional security would be provided by National Land & Investment Co.'s guarantee to pay the principal and interest on the bonds.*" (p. 710a) (Emphasis added)

Indeed, as the chancellor indicated in his adjudication "thus, although it is true that the tenants in the apartment building will use at least some of the parking spaces in the Parking Authority garage, it is likewise true that without the apartment building there would be no garage at all".

Despite the chancellor's detailed findings of fact, not one of which was even challenged in this Court, the Majority Opinion advances the following reasons for invalidating the Academy House Project:

1. The transaction was negotiated rather than obtained as the result of competitive bidding.

2. The Parking Authority exceeded its statutory authority.

3. The Project was primarily and predominantly private in nature.

4. There was no demonstrable present or future anticipated parking need for the facility proposed.

In reaching these conclusions, the majority used wrong facts, applied wrong law, and, therefore, necessarily arrived at wrong conclusions.

What the Majority has done here is to substitute its own judgment and its own views on strictly economic and administrative matters involving the exercise of administrative judgment, for that of the Parking Authority entrusted under the law to exercise that judgment. This it has no right to do. (*Schwartz v. Urban Redev.*, supra.) A reading of the Majority Opinion against the background of the uncontested facts reveals that the Majority is arrogating unto itself the powers and duties of a super Parking Authority, which, it is unnecessary to state, it certainly has no constitutional power to do.

Without an expert staff, without the indispensable experience, without the time needed to investigate at first hand each and every facet of the reasons for concluding that there was a public need for this parking facility and that the Academy House transaction was the feasible and proper method of supplying that need, the Majority proceeds to denounce the Academy House transaction, not because the law impels that denunciation but only because the Majority says in effect: "We doubt that this is a good place for a parking garage," and "If it is, we don't believe this is a good way to bring it about."

This is an extra-judicial performance which this Court has constantly frowned upon in the past and will unquestionably continue to discountenance.[2] It should do so here.

---

[2] *Nine-Ten Chestnut Corp. v. Phila. Parking Authority*, 373 Pa. 274; *Lazrow v. Phila. Housing Authority*, 375 Pa. 586; *Spann v.*

In exercising its discretion to proceed with the Project, the Authority considered 39 separate fact situations, none of which is challenged in point of physical reality. Most of them are simply ignored by the Majority. A few are cavalierly discarded as a matter of opinion! What the Majority in effect says that if its members sat with the Parking Authority they would not concur in the Authority's judgment. I venture to suggest that if the Majority were factually aware of these 39 different material situations, it would not reject, but concur in the conclusion of the Authority.

However, regardless of all this, and I repeat, under our well reasoned and hitherto uninterrupted line of decisions, this Court has always refrained from substituting its judgment for that of an administrative body properly performing its duty. We should not now depart from that salutary policy. Any modifications of that policy would be not a mere exercise in semantics; it would result in a procedure where the non-expert views of appellate judges would be substituted for those of the expert agencies. It would lead to a lack of uniformity in the important business of public parking or whatever else might be the function and mission of the particular agency involved. It would result in mere academic theorizing displacing the iron and steel beams, girders and columns which go into constructing the edifice of an orderly well-organized society.

When, as here, the court below has inquired fully into the matter and has upheld the transaction on the basis of record facts, we should not overrule both the court below and the administrative agency.

I will now consider seriatim, the appellant's grounds of challenge upheld by the Majority.

*Joint Boards of School Directors*, 381 Pa. 338; *Seligsohn v. Phila. Parking Authority*, 412 Pa. 372.

### (1) The transaction resulted from negotiated agreements rather than from competitive bidding

We have already considered whether and to what extent competitive bidding is required in this kind of transaction. In that part of this Opinion relating to the Rittenhouse Square Project, I have pointed out that in the Parking Authority Law of 1947, as amended, the only requirement of competitive bidding refers to *construction done by the Authority* where the entire cost exceeds $1000. As the learned chancellor stated in his adjudication, the chairman of the Authority testified without contradiction that the Authority intends to follow this procedure in contracting for the construction of the garage. Therefore, the plaintiffs can have and should have no complaint in this respect.

So far as the lease of the air rights for the construction of the superstructure is concerned, competitive bidding is not required. As in the case of Rittenhouse Square Project, the transaction did not lend itself to competitive bidding because of its uniqueness. To make the Project a sound economically feasible development, the site occupied by the John Bartram Hotel was required. It would have been futile and useless to demand competitive bidding for lease of air space, a substantial part of which includes space above the ground on which the old John Bartram Hotel now rests.

Once it is concluded (as it must be) under the Parking Authority Law that the Parking Authority has the power to build a garage and lease the space above it, it must inevitably follow that to require competitive bidding under the peculiar circumstances here involved would be to demand the performance of a vain act. Accordingly, it was legal and proper to negotiate the contract. *Silsby Mfg. Co. v. Allentown,* supra. Again, as I also pointed out in that part of this Opin-

ion relating to the Rittenhouse Square Project, there was no requirement for following competitive bidding procedures in so far as the lease of the first floor of the garage was concerned. In holding to the contrary, the Majority completely confuses the difference between contracting on a "fair competitive basis" and contracting as a result of "competitive bidding". Under the circumstances of this case, the entire project was leased on a fair competitive basis. There is no showing to the contrary.

(2)  That the Parking Authority had exceeded its statutory authority

Nowhere does the Majority Opinion specify in what respect the Parking Authority has exceeded its statutory authority. Its authority is to build and maintain public parking garages and other parking facilities. The Legislature has expressly provided that in doing so, the Authority may sell or lease the space above the parking garages for commercial use other than parking. That is what is contemplated in the Academy House Project, nothing else.

(3)  That the Project was primarily and predominantly private in nature

The Majority Opinion admits that even in the case of condemnation of private property, the fact that there may be an incidental benefit to private parties will not invalidate the taking, but it goes on to say that "the Parking Authority Law confers no power on the Authority to act other than for the public benefit in providing for off-street parking facilities. Accordingly, the Academy House Project may not be permitted to proceed unless as presently envisioned it will result predominantly in public benefit through the crea-

tion of additional off-street public parking facilities commensurate with the public investment in the Project."

The key to the basic misunderstanding by the Majority of the basic issue resides in the phrase, "public investment in the Project." This is a statement woven out of a conjuration floating higher than the roof of the projected apartment house. Not one single Lincoln penny of public moneys,—federal, state or city— will be invested in the project! We are not dealing here with a case in which a governmental agency is employing public funds to acquire property. We do not have to do here with taxpayers' moneys. We are not contemplating here any raid on the municipal, state or national treasury. The Majority is standing guard at an empty exchequer across which falls not the slightest shadow of monetary aggression. Thus, it speaks without a page of the record to stand on, when it asserts that "the Academy House Project involves substantial public financing of a private endeavor." Indeed, the 800-page record is all to the absolute contrary.

In finding of fact No. 6, the learned chancellor, on ample evidence before him, found, and that finding was confirmed by the court en banc: "As rent for the garage and the air space above it, National Land will pay the Parking Authority an amount that will include the principal and interest on the bonds issued by the Authority to finance the erection of the garage, and the term of National Land's lease of garage and air space will be coordinated for the life of these bonds". In finding of fact No. 6, also affirmed by the court en banc, the learned chancellor found that the lessee will pay for the entire cost of construction of the superstructure. Thus private parties will initially finance the construction of the garage by buying bonds issued by the Authority and National Land will pay

in the form of rent, sums sufficient to pay both the principal and the interest on these bonds. How, then can the Majority speak of "public investment in the Project?" Let it here be stated unequivocally, conclusively, definitively and beyond cavil: National Land will pay for the entire cost of construction both of the garage and the superstructure above it.[3]

### (4) The challenge that there was no demonstrable present or future public need for the parking facility proposed

In view of the record in this case, the Majority Opinion in this respect reads like a few pages from Alice in Blunderland. As the learned court below in its opinion sur exceptions correctly declared: "The record shows that the Parking Authority could reasonably conclude that there is both a present and future need for the project, and that the Authority has not abused its discretion or acted arbitrarily or contrary to law."

In reaching its conclusions, the Authority took into consideration the following reasons, inter alia, for its finding that there was both a public and future need.

"3. That there is at the present time a shortage of parking spaces in the Broad and Spruce Street area (508a-509a, 511a-512a, 514a).

"4. That there is a present need for a public parking project at the site of the Academy House Project (508a-511a, 514a), which is a proper location (414a, 514a), and that the size of the proposed public parking garage is a correct one in relation to the need (514a).

"5. That the Academy House Project would have an impact on traffic (414a) which was examined, tak-

---

[3] Of course, all costs will be borne by the lessees. Naturally, this will include the purchase price of the John Bartram Hotel.

ing into account the work of the City's traffic engineers, and the studies of Wilbur Smith and Associates as to where parking demand generated in this specific location (414a); and, in this regard, the Authority consulted traffic engineers and discussed traffic ingress and egress, number of spaces, street capacity, and related matters, and had them explore alternative ways in which the traffic flow could go (414a), and received a report from them that they were satisfied with the proposal (414a).

"5. That there has been a general increase in center City traffic, based on a number of improvements that have been going on there (512a).

"6. That there were a number of new facilities which were supposed to come into existence within the next ten year period (131a).

"7. That there will be increased parking needs regardless of the Academy House Project itself, and that whatever parking that would be generated by the apartment houses in the Academy House Project would be adequately served by the public parking garage underneath it, and that the size of the garage is designed to take into account both types of generation (512a).

"13. That there has been some discussion or talk of, but there is not under consideration, a proposed large public garage at Broad and Pine Streets in connection with the Museum College of Art (134a, 503a-504a). Its development is uncertain (134a).

"16. That there was to be a move of the Library Company from its present location at Broad and Christian Streets to the general area of the Academy House Project, and that there was discussion of one or another institutions coming into this area, as well (512a).

"17. That the size of the proposed garage and use of the air-rights thereabove, is consistent with parking demand (425a) and the size of the land area (414a).

"23. That the type of building to be constructed in the air-rights above the public parking garage is proper in relation to land coverage and density (414a), and provides for the maximum use of the site (Exhibit D-25, 888a-896a).

"24. That the project's size is proper, in light of the studies of Wilbur Smith and Associates, the parking demand, and the relation of the use of the air-rights over the parking structure (425a)."

In the face of these record facts, how can this Court seriously say there is no present or future need for additional parking at this site? Only by arbitrarily substituting its judgment for that of the Philadelphia Public Parking Authority can it do so.

The extent to which the Majority Opinion purports to substitute the judgment of this Court for that of the experts, is revealed by its total disregard and overturning of the chancellor's findings of fact affirmed by the court en banc.

The Majority Opinion indeed purports to out-expert one of the internationally acknowledged experts on traffic and parking, Wilbur Smith and Associates. The Authority relies on traffic engineers' views on traffic ingress and egress, number of spaces, street capacity, and many other matters intimately related to the present and future need for a parking garage here.

The Majority Opinion does not state on what technical knowledge or traffic experience it overrules technical experts on such technical aspects as "projection of space required", "the contemplated generation of a significant demand" and the other myriad of matters which are basically and inherently within the province of experts employed by the Parking Authority and on whose reports the Parking Authority to that extent based its judgment to proceed with the project.

The Majority Opinion in this respect dramatically demonstrates the folly of this Court's attempting to

substitute its judgment on administrative matters, technical in nature and requiring years of intensive study, for that of the administrators empowered by law to perform such functions.

The plaintiffs have had more than their day in court in this case. They have had exhausting depositions taken before the trial of the case. They have had a trial in which every facet of the case was fully and thoroughly explored. The chancellor has made findings of fact which are totally uncontradicted and in every instance are supported by ample evidence in the record. The court en banc has affirmed these findings. The plaintiffs have argued and reargued these appeals. There should and must be a repose to this litigation.

When, as here, a fair reading of the entire record reveals that a competent, responsible body of public-spirited citizens has in good faith reasonably and upon the basis of an impressive record of exhaustive investigation of every facet of a complicated situation concluded to proceed with a great development promising so extensive an improvement as the Academy House Project we should commend and not condemn it.

As a matter, strictly of law, our judicial function is exhausted when we find no basis in law or fact to stop the project. There is no error in the lower court's adjudication and opinion dismissing exceptions.

We must and should affirm.

Mr. Justice EAGEN joins in this dissenting opinion.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

I disagree with the majority's decision with respect to both the Academy House Project and the Rittenhouse Square Project. Regarding the latter, I would sustain the decree below on the basis of the excellent and comprehensive opinion of Judge SPAETH, whose

analysis of the issue of the standing of plaintiffs to challenge the Rittenhouse Square Project is a thoroughly enlightening presentation of the applicable Pennsylvania law.

With respect to the Academy House Project, I would affirm the decree below because of the very logical discussion by Judge SPAETH of the merits of the case. However, since I do not believe that plaintiffs had standing to maintain that portion of their action, I would not have required a decision on the merits. Except in that regard, I am satisfied that all of the chancellor's findings of fact and law, which were approved by the court en banc, were amply supported by the record. While I might disapprove of the grant by the Authority to the developers of exclusive options to purchase their respective projects at some future time, I do not believe that that issue is presently ripe for judicial determination, and will not be, until there has been an attempt to exercise either option.

In addition, I feel that the position taken by the majority is detrimental to the best interests of our cities and our State. It has long been recognized that a municipality is in a much better position than a private individual or a group of individuals to solve the problem of parking.

Municipalities make parking facility decisions on considerations of the total parking problem, the needs of the persons who will utilize the parking areas and the relationship of parking to community objectives and other municipal operations. Private parking is supplied only on a profit basis and, following the profit motive, when there is no profit there is no parking. The city or the parking authority can use its power of eminent domain to condemn property for parking purposes and can avoid exploitation of people desiring in-city parking by property owners who hold out for exorbitant prices.

The city or authority also can better guarantee the permanency of a parking facility. Private owners continuously face temptation to sell their facilities at a profit for non-parking purposes and hence the parking facility is lost to the community and to the area served.

It is generally recognized that government must subsidize parking. Government has done so both by tax considerations extended to the parking facilities and by permitting the facilities to borrow money more readily and on more favorable terms than can be secured by a private borrower. As a return to government, subsidized parking helps sustain and maintain property values and taxes on real estate in the area served, and it produces public revenue from the commercial activities that thrive as a result of the parking facilities.

The whole economic life of our cities is dependent upon the establishment, development, and continuation of parking facilities. The position taken by the majority curtails the development of center-city Philadelphia and does so by protecting private operators of parking lots who have been notoriously deficient in providing parking facilities for the community. The majority strikes down this joint venture between the public and private interests and thus retards the growth and development of the cities of our State.

I differ from and dissent to the determination of the majority.

DISSENTING OPINION BY MR. JUSTICE EAGEN:

I join in the cogent and unanswerable dissent of Mr. Justice MUSMANNO. However, I would further hold that at least in the case involving the Rittenhouse Square Project, the plaintiffs lack standing to prosecute the action.

A taxpayer's suit lies only to prevent a wrongful expenditure of public funds or a wasting of public as-

sets: *Gericke v. Philadelphia*, 353 Pa. 60, 44 A. 2d 233 (1945). The Majority opinion reasons that public assets are affected, because after fifty years or more ownership of the Rittenhouse Square Project property may revert to the City of Philadelphia. No previous decision of this Court has entertained such a broad view of taxpayers' suits. In every such case, within my knowledge, where this type of action has been sustained, the property involved was public at the time the action was instituted. Expectancy of public control was not enough.

Moreover, there is no question of Philadelphia tax funds here involved. In *White v. Philadelphia*, 408 Pa. 397, 184 A. 2d 266 (1962), we recently held that a taxpayer of Philadelphia had no standing to attack a city ordinance that provided for the acquisition of property, which was to be paid for solely by funds of the federal government. We said no direct injury to the taxpayer was involved. Also, that case concerned a public housing project, ownership of which, under the pertinent law, would eventually revert to the municipality. Nonetheless, we ruled the plaintiff lacked standing. The decision of the Majority is clearly inconsistent with *White,* supra, and in my opinion overrules it.

I, too, strongly dissent.