Harold S. Campbell *v.* The Bethlehem Parking Authority, The Redevelopment Authority of The City of Bethlehem, and The City of Bethlehem. Harold S. Campbell, Appellant.

446

Argued June 4, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Richard A. Sprague,* with him *David Berger, Michael K. Simon* and, of counsel, *David Berger, P. A.* for appellant.

*Thomas M. Kittredge,* with him *Hugh M. Morrison* and, of counsel, *Morgan, Lewis & Backius,* for appellee, Bethlehem Parking Authority.

*Robert J. Washko,* Assistant City Solicitor, with him *Robert W. Rudas,* City Solicitor, for appellee, City of Bethlehem.

*Michael E. Riskin,* for appellee, Redevelopment Authority.

OPINION BY JUDGE KRAMER, July 25, 1975:

This is an appeal filed by Harold S. Campbell from orders[1] of the Court of Common Pleas of Northampton County dismissing Campbell's complaint in equity which sought to enjoin (a) the Bethlehem Parking Authority; (b) the Redevelopment Authority of the City of Bethlehem; and (c) the City of Bethlehem.[2] The case involves the proposed construction of a parking garage in the City by the Parking Authority which Campbell contends is to be constructed "for the predominant purpose of serving parking desires of two private commercial interests in the Center City Urban Renewal areas. . . ." The court below found and held that the garage was predominantly and primarily a public use with any private gain only incidental.

Shortly after World War II, the City, like many metropolitan areas of our State, commenced a study through independent experts to provide planning with respect to

---

1. Decree nisi dated February 11, 1975, and final decree dismissing all exceptions dated March 24, 1975.

2. The specific relief prayed for against each defendant was different. Campbell sought to enjoin the Parking Authority from acquiring land, issuing bonds, and constructing the garage. He also sought to enjoin the Redevelopment Authority from conveying land to the Parking Authority for the garage, and to enjoin the City from guaranteeing the Parking Authority's bonds.

the City's urban renewal. That study culminated in 1956 with a report providing for a 14-stage program of community development. In 1963 the City commenced its urban renewal program with one of its major projects concentrated in what is known as the Central Business District. All of the experts who made any proposals to the City recognized that off-street parking in the Central Business District would be an indispensable part of any renewal program. In 1960, a comprehensive plan was prepared which was approved by the City's Planning Commission and Council. Once again the necessity for off-street parking facilities was recognized. The City commenced its first urban renewal project in the Central Business District in 1962. Some of the early projects were a new city hall, city council rotunda, and city library.

On July 8, 1968, the City's Planning Commission certified the Central Business District as a blighted area, and in that same year, through independent experts, the City prepared an "update" to its planning for the Central Business District. On November 25, 1969, the City Council approved the updated report (hereinafter the "1969 report") which was later approved by the City's Planning Commission and a special citizens' task force (which had been established by the City's Mayor). The 1969 report recommended that a municipal parking authority be formed to provide off-street parking for a total of 3,000 vehicles in five parking garages in the Central Business District. It also called for a new hotel, concert hall, exhibit hall, office and professional buildings, transportation center, retail shopping center, two new department stores, and other improvements. The 1969 report also recommended that assurance be given to prospective developers that parking facilities would be adequate to make the Central Business District competitive with suburban shopping centers. Thereafter the City organized an extensive effort to attract redevelopers locally and from distant places. All of the prospective redevelopers

insisted upon commitments for adequate parking facilities.

On June 2, 1970, the City created the Parking Authority, which engaged consulting engineers to assist in its planning. After more than two years of unsuccessful effort to attract redevelopers, the Redevelopment Authority entered into a redevelopment contract with the First Valley Bank for the construction of an 11-story office and professional building at the corner of New and Walnut Streets. About a year later, a partnership of local businessmen, known as Bethlehem Plaza, entered into a redevelopment contract for the construction of a retail shopping mall west of the First Valley Bank building. At the time these contracts were made, a parking garage was planned as a part of the complex on the northerly side of Walnut Street. Later, when the plans for Walnut Street were redesigned so that the street could be widened, the redevelopment plan was amended, and a public parking garage was proposed directly across Walnut Street (which was the location which was originally recommended in the 1969 report). The 1969 report included a recommendation for an elevated pedestrian walkway from the garage on the south side of Walnut Street to the shopping mall on the north side, as did the final plan.

Eventually the Redevelopment Authority obtained title to the property (including air rights over what is known as the Fretz property) necessary for the construction of the proposed Parking Authority garage on the south side of Walnut Street. The Redevelopment Authority conveyed the necessary real estate and air rights to the Parking Authority.

During all of the period in which the various planning, study and negotiations took place, the City had an ordinance requiring off-street parking in its Central Business District. This ordinance had been in effect since 1960. Because of the City's failure to attract redevelopers, caused by the lack of adequate parking facilities, City

Council on November 26, 1974, enacted an ordinance repealing the off-street parking requirements. This had the effect of amending the City zoning ordinance. There was no appeal taken by anyone from this amendment, and, although Campbell appeared to challenge that amendment in his original complaint, counsel for Campbell made it clear on the record that Campbell was raising no issue concerning the legality of the amendment to the City's zoning ordinance.

On November 4, 1974, City Council approved the construction of the parking garage and approved a lease of the garage by the City under a contract providing that the Parking Authority would operate the garage. Application for approval of this contract and the financing was filed by the City with the Department of Community Affairs of the Commonwealth of Pennsylvania, pursuant to the provisions of the Local Government Unit Debt Act, Act of July 12, 1972, P.L. 781, 53 P.S. §6780-1 et seq (Supp. 1975-1976). The Department of Community Affairs approved the project on November 14, 1974. No appeal was taken by anyone from this approval as is provided by section 809 of the Local Government Unit Debt Act, 53 P.S. §6780-359 (Supp. 1975-1976). Although Campbell challenged the financing arrangement by the City and the Parking Authority in his complaint, counsel for Campbell at the hearing before the court below agreed to strike that challenge from the case. Counsel also stated that he was not challenging in any way the *power* of the Redevelopment Authority to convey the subject property to the Parking Authority. Campbell does not suggest any fraud, misrepresentation or other improper action by any public official. He acknowledges that there is not even the slightest hint of any benefit or gain to be derived by any government or authority official.

On November 13, 1974, Campbell commenced this action by the filing of a writ of summons and, after having been ruled upon to file a complaint the following day, the

complaint was filed on December 4, 1974. After eliminating the issues relating to the legality of the zoning ordinance amendment and the financing of the parking garage, the sole issue remaining is Campbell's allegation that the parking garage is intended to accommodate predominately private interests and that the parking garage will impose an enormous financial burden on the taxpayers, without sufficient public benefit.

Our summary of the facts would not be complete without a more specific reference to Campbell. For more than 40 years he has been a real estate developer in Bethlehem. He is well-versed in municipal affairs, particularly as they pertain to real estate development. He and his family own the Westgate Shopping Mall, a shopping center of about 40 retail stores located only one and one-half miles from the Central Business District. Interestingly, about half of the leases in the Westgate Shopping Mall have provisions for rents to be determined partially as a function of the sales volume of the tenants. It is quite obvious that the result of this case will have a direct effect on Campbell's personal financial affairs.

After the First Valley Bank and the Bethlehem Plaza redevelopers had acquired their respective land on the north side of Walnut Street and the design work for the garage on the south side of Walnut Street was completed, the Parking Authority advertised for bids for the construction of the garage. Bids were received on October 22, 1974, and, on October 29, 1974, the Parking Authority accepted the proposal for the purchase of Parking Authority bonds to finance the garage. The proposal provided that a certificate be delivered at the time of the settlement stating that there was no litigation pending contesting the validity of any action taken by the Parking Authority in connection with the issuance of the bonds. The bonds were printed and dated November 15, 1974. As a direct result of this lawsuit the contractors' bids have been invalidated or withdrawn, and bonds totaling $4,380,000 lie dormant.

The court below, in a well-reasoned opinion, found that the parking garage is intended to serve anyone "on a first-come-first-served basis" and that no one will have any preferential right to use the facility nor will anyone be charged at a rate less than the standard public charge set by the Parking Authority. The court also found that the proposed parking garage would be built to serve the parking needs of the entire Central Business District. In addition to the tenants and customers of the First Valley Bank and Bethlehem Plaza, this garage will also serve the people who visit other buildings in the vicinity, such as the Union Bank, the Bethlehem Club, the YM-YWCA, the Chamber of Commerce, and the Bethlehem Area School District building. The court also found that there was no agreement or understanding granting any person any preference over the general public in the use of the proposed parking garage, that all of the officials of all of the defendants acted in the good faith belief that their acts were in the best interests of the citizens of Bethlehem, and that none of them had received any promise, payment, thing of value, or personal benefit from any of the decisions taken or acts performed with reference to the proposed parking garage. The court concluded that the parking garage was intended for a public purpose under the Parking Authority Law, Act of June 5, 1947, P.L. 458, *as amended*, 53 P.S. §341 et seq.

The lower court pointed out that by the very nature of the facility and its need, private interests might be benefited incidentally, but the court held "that the Walnut Street Parking Garage is predominately and primarily a public use, and any private gain to the First Valley Bank and Bethlehem Plaza Mall is merely incidental."

Our scope of review is to determine, after a review of the entire record, whether the court below abused its discretion or committed an error of law. As was noted by President Judge BOWMAN in *Ross v. Philadelphia Federation of Teachers*, 8 Pa. Commonwealth Ct. 204, 213, 301 A. 2d 405, 409-410 (1973) :

"Thus, insofar as concerns a chancellor's findings of facts (not his inferences and deductions from facts not in esse), the law is clear that an appellate court can review these findings only where there has been manifest or clear error, a clear abuse of discretion, etc. Given sufficient evidence which justifies the findings and logically sound, reasonable inferences and conclusions derived therefrom, the chancellor's decision will stand. Even a preponderance of testimony against the findings will be insufficient if there is testimony which, if believed, will warrant them."

See also Groff v. Borough of Sellersville, 12 Pa. Commonwealth Ct. 315, 314 A. 2d 328 (1974). Having reviewed the record consistent with our scope of review, we find no manifest abuse of discretion in the chancellor's decision that the parking garage is predominately and primarily for a public use and that any private gain is incidental.

Campbell relies heavily upon the decision of our Supreme Court in Price v. Philadelphia Parking Authority, 422 Pa. 317, 221 A. 2d 138 (1966), which reversed a chancellor's decision and held that the primary and predominant purpose of the garage there in question was private in nature. We conclude that Price is not controlling. Price is easily distinguishable on its facts. In that case the developer owned part of the land which the parking authority agreed to acquire, and, thereafter, the authority was to lease the air rights above the garage to the developer for the purpose of erecting a 22-story building. In Price, although title to the land was to remain in the parking authority, and although the rental to the developer would cover all of the expenses and debts of the parking authority, the developer was given special treatment to use ground-level space for its commercial purposes. The developer was also to be given an exclusive option to purchase at the end of the term. In Price the developer received real benefits in dollars and property

rights, none of which are present in this case. Here title to the property remains with the Parking Authority and eventually the City. Here there is no diminution of real estate taxes. Indeed, the City will realize increased revenues because of this development. In *Price* the proposal was not part of a comprehensive planned urban renewal area, whereas in the instant case the parking garage is indispensable to the remainder of the Central Business District's urban renewal plan. In *Price* there was no approval by the city's planning commission and its governing body; here, the defendants have gone to extraordinary lengths to make certain that each step in the development was approved by the proper authorities. In *Price* our Supreme Court held that the net increment of parking space to the public was merely incidental with the more substantial benefits accruing to the private developer. In this case the parking statistics indicate that the substantial benefits will run to the public.

Our Supreme Court also pointed out in *Price* that in determining whether a project is essentially public or private in nature, we are confronted with an issue analogous to that frequently presented in eminent domain proceedings. Recently this Court, through Judge MENCER in an eminent domain case observed that "property cannot be taken by government without the owner's consent for the mere purpose of devoting it to the private use of another . . . . the taking by eminent domain does not lose its public character merely because there may exist therein some feature of private gain, for, if the public good is enhanced, it is immaterial that a private interest also may be benefited." *Borough of Big Run v. Shaw,* 16 Pa. Commonwealth Ct. 623, 626-627, 330 A. 2d 315, 316 (1975). *See also Kramer Appeal,* 438 Pa. 498, 266 A. 2d 96 (1970) ; *Belovsky v. Redevelopment Authority of the City of Philadelphia,* 357 Pa. 329, 54 A. 2d 277 (1947) ; and *Hegedic v. Department of Transportation,* 8 Pa. Commonwealth Ct. 551, 304 A. 2d 181 (1973). Unlike

*Price,* this is not a case where there is a substantial degree of public involvement and investment in a private profit-making venture. This is a case where the public authorities and the governing body of a municipality have gone to great pains to redevelop a blighted area and have enticed substantial amounts of private investment through utilization of public investment for public purposes in an urban renewal project.

This case is more closely related to our Supreme Court's opinion in *Seligsohn v. Philadelphia Parking Authority,* 412 Pa. 372, 194 A. 2d 606 (1963) than it is to *Price, supra.* In *Seligsohn* our Supreme Court affirmed the decision of a chancellor based upon a record indicating that the parking authority's proposed parking garage involved a proper public function. In *Seligsohn* the public had access to the garage even though it was physically connected to two large private department stores in Philadelphia. Our Supreme Court there reasoned that the need for this public service was based upon studies and surveys made over a long period of time and concluded that the proposed parking facility was predominately for the public use.[3]

In the absence of bad faith, fraud, capricious action, or abuse of power adequately proven in the record, the appellate courts of this State will not interfere with the discretion granted to local municipalities and authorities by the General Assembly. *See Eways v. Reading Parking Authority,* 385 Pa. 592, 124 A. 2d 92 (1956), and *Nine-Ten Chestnut Corporation v. Philadelphia Parking Authority,* 373 Pa. 274, 95 A. 2d 553 (1953).

---

3. For other cases elaborating upon the term "public use" in different contexts *see Pittsburgh Public Parking Authority v. Board of Property Assessments, Appeals and Review,* 377 Pa. 274, 105 A. 2d 165 (1954) ; *McSorley v. Fitzgerald,* 359 Pa. 264, 59 A. 2d 142 (1948) ; and *Dorman v. Philadelphia Housing Authority,* 331 Pa. 209, 200 A. 834 (1938).

456

In summary, we conclude that all of the findings of the court below are based upon substantial evidence and, therefore, the court did not abuse its discretion. This record more than adequately supports the lower court's conclusion that the Walnut Street Parking Garage is predominately and primarily a public use, and any private gain by the First Valley Bank and Bethlehem Plaza Mall is merely incidental. We, therefore, affirm.