This appeal is from a judgment of the circuit court which issued a writ of mandamus directed to the probate judge ordering him to vacate an order granting the City of Birmingham's application for condemnation of certain lands for the construction of an off-street parking facility.
This condemnation proceeding involves two complicated sets of transactions between the City of Birmingham and private developers.
On June 28, 1979, the City of Birmingham (City) entered into an agreement with Canal-Randolph of Alabama, Inc. (Canal) for the purchase of Lots 13 through 18 (the Molton Hotel site) in Block 48 of downtown Birmingham. The terms of the agreement provided that Canal would acquire the land by purchase and would sell a one-half interest in the property to the City. Canal would then construct on the site a multi-story office building, which would include a 750-space parking deck. The City or its Parking Authority would reimburse Canal for its parking deck construction costs, and the parking deck would belong to the City under a condominium agreement. The contract also gave either party an option to purchase the other party's one-half interest for a price determined by a specified formula. Canal purchased the property for $1,609,225.00 and on August 16, 1979, the City purchased a one-half interest in the property for $804,612.51. During this period, Canal entered into a joint venture agreement with Continental Cities Company, Inc. with respect to Canal's one-half interest in the Molton Hotel site.
When Canal-Continental failed to comply with the construction schedule, the City exercised its option under the original contract to purchase Canal-Continental's one-half interest for $1,298,000.00.
On this same date, November 4, 1980, the City entered into a contract to sell the Molton Hotel site to Birmingham Associates, *Page 85 
a general partnership composed of the principal officers of Johnson-Rast Hays Co., Inc. (JR H), for $2,050,000.00. Birmingham Associates then entered into a joint venture agreement with Equitable Life Assurance Society of the United States, and Birmingham Associates assigned the contract to purchase the Molton Hotel site to the joint venture. The purchase agreement provided that the City would construct, pay for, and maintain a parking deck with at least 350 spaces on property east of and immediately adjacent to the office building which would be constructed on the Molton Hotel site by the joint venture. A sufficient number of the spaces, not to exceed 30, would be assigned to JR H employees.
On November 25, 1980, the City received a parking feasibility report which recommended the construction of three off-street parking facilities in downtown Birmingham to satisfy both existing and projected needs of its populace. The study recommended that Lots 19 through 24 (the Exchange Bank and Williams properties) of Block 48 be the location of a parking deck to include 630 spaces with 12,000 square feet of commercial area. The city council passed a resolution to construct a 630 space parking facility on Lots 19 through 24 but did not authorize the construction of any commercial space within the proposed off-street facility.
On January 23, 1981, the City filed in probate court its application for condemnation of Lots 19 and 20 (the Exchange Bank property), and Lots 21 through 24 (the Williams property) of Block 48, downtown Birmingham. The condemnees filed motions to dismiss, answers, objections, and a petition for removal to federal court. The federal court, however, remanded the case to the probate court. After a two-day hearing, the probate judge entered an order granting the petition for condemnation and then set a hearing date for the appointment of commissioners.
On July 21, 1981, the condemnees filed a joint petition for mandamus to the circuit court, seeking an order directing the probate judge to vacate his order and to dismiss the City's application for condemnation. The circuit judge granted a stay of the probate court proceedings and conducted a hearing which was limited to a review of the proceedings before the probate court. Exchange National Bank thereafter settled with the City and was no longer considered a party to the mandamus proceeding. On June 1, 1982, the circuit court issued a final judgment which held the proposed condemnation to be an unconstitutional taking of private property for a primarily private purpose in violation of Ala. Const. art. XII, § 235 and Ala. Const. art. IV, § 94 (1901, amended 1956). The circuit judge thereby granted the writ of mandamus and ordered the probate court to vacate its order granting the condemnation application. The City filed a notice of appeal on behalf of the probate judge as nominal defendant and obtained a stay of the circuit court order pending appeal.
The issues presented for review are 1) whether the presumption in favor of the findings of the trier of fact attaches to the probate judge's findings or to the circuit court's findings when exercising a general superintendance over the probate court; 2) whether the City has statutory authority to condemn the Williams property to construct an off-street public parking facility; 3) whether there was sufficient evidence from which the probate judge could have determined that the proposed parking facility did not violate Ala. Const. art. XII, § 235; and 4) whether there was sufficient evidence from which the probate judge could have determined that the proposed condemnation did not violate Ala. Const. art. IV, § 94 (1901, amended 1956).
 Standard of Review
Various presumptions attend the trial court's findings of fact. When the trial court hears the evidence without a jury, its findings of fact will not be disturbed unless clearly erroneous or manifestly unjust. Leslie v. Pine Crest Homes,Inc., 388 So.2d 178 (Ala. 1980). This presumption of correctness also accompanies findings of *Page 86 
fact made by a circuit judge in a mandamus proceeding where the judge actually hears the evidence upon which its findings are based. Freeman v. Smith, 409 So.2d 770 (Ala. 1982); Anderson v.Mullins, 281 Ala. 609, 206 So.2d 856 (1968); Southern RailwayCo. v. Todd, 279 Ala. 260, 184 So.2d 341 (1966); Chestang v.Burns, 258 Ala. 587, 64 So.2d 65 (1953). In condemnation proceedings, moreover, the conclusion of the trier of fact is entitled to great weight. State v. Central of Georgia R.R.,293 Ala. 675, 309 So.2d 452 (1975).
Yet how do these presumptions apply where the probate judge, exercising jurisdiction under Code 1975, § 18-1-1, and the circuit judge, exercising a general superintendence over the probate court under Code 1975, § 12-11-30 (4), both make findings of fact? These presumptions are limited to situations where the trial court actually sees and hears the evidence upon which its findings are based:
 "[T]he trier of fact, the trial court without a jury, unlike an appellate court later reviewing the matter from a written record, occupies a position of peculiar advantage enabling it to see and hear firsthand the evidence as it is presented. From that vantage point the trier of fact can observe the demeanor of the witnesses, listen to the inflections and intonations of their voices during oral testimony, and study their eyes, facial expressions, and gestures — all of these sensory perceptions which play a critical role in the factfinder's determination of which witnesses are to be afforded credibility when conflicting testimony is given. Consequently, this court will rarely disturb the judgment of the trial court. . . ."
Thomas v. Davis, 410 So.2d 889, 892 (Ala. 1982) (citations omitted). Conversely, where the court hears no oral evidence in reaching its findings, this Court indulges no presumption of correctness in favor of the judgment of the trial court. Exparte British Steel Corp., 426 So.2d 409 (Ala. 1982) (citations omitted).
The circuit court rendered its decision on the record from the probate court and its judgment is not entitled to a presumption of correctness. The evidence before the probate court was mostly uncontroverted, so we deem resolution of the standards-of-review issue to be largely academic. A question of law was presented to the circuit court as well as to this Court.
 Authority to Condemn for the Construction of an Off-Street Public Parking Facility
Whether a municipality has statutory authority to condemn property for off-street public parking facilities is an issue of first impression for this Court.
Section 11-47-170, Code 1975, which grants municipalities general condemnatory powers, provides that
 "[w]henever in the judgment of the council or other governing body of a city or town it may be necessary or expedient for the carrying out and full exercise of any power granted by the applicable provisions of this title or any other applicable provision of law, the said town or city shall have full power and authority to acquire by purchase the necessary lands . . . or, for the purposes for which private property may be acquired by condemnation, may proceed to condemn the same in the manner provided by this article, or by the general laws of this state governing the taking of lands or the acquiring of interests therein for the uses for which private property may be taken. . . ."
Section 11-47-241 (1), Code 1975, specifically grants to cities having a population of 34,000 or more the authority "to plan, establish, develop, acquire, construct, enlarge, improve, maintain, equip, operate, regulate and protect parking facilities." The term "parking facility" includes any "building for off-street parking of motor vehicles." Code 1975, §11-47-240 (3). Section 11-61-2, Code 1975, enlarged the scope of this provision by granting to any city or town the aforementioned powers.
Although we agree with the circuit court's initial premise that the power of eminent domain cannot be exercised until *Page 87 
conferred by statute, either in express words or by necessary implication, Dean v. County Bd. of Education, 210 Ala. 256,97 So. 741 (1923), we do not agree with the circuit court's conclusion that no statutory authority exists for a city to condemn property for an off-street public parking facility.
The circuit court thought it significant that Code 1975, §11-47-241, and § 11-61-2, did not specifically grant cities the power of eminent domain in connection with parking facilities and that Code 1975, § 11-47-170, the general condemnation statute, failed to mention the specific purpose of off-street public parking. In so holding, the circuit court failed to adhere to the rule of statutory construction which requires that all statutes relating to the same subject or having the same general purpose be read together to constitute one law.American Life Ins. Co. v. State, 226 Ala. 383, 147 So. 168
(1933); City of Mobile v. Smith, 223 Ala. 480, 136 So. 851
(1931). Yet, when these three statutes are read in pari materia, it is clear that § 11-47-170 allows cities to condemn property to carry out the parking facility powers bestowed by §11-47-241 and § 11-61-2 if construction of an off-street public parking facility is a purpose "for which property may be acquired by condemnation. . . ."
Because Code 1975, § 11-47-170, fails to define the phrase "for the purposes for which property may be acquired by condemnation . . .," we must examine prior law, related statutes, and constitutional provisions to determine the legislative intent. State v. AAA Motor Lines, Inc., 275 Ala. 405, 155 So.2d 509 (1963).
Our court has determined that property may not be condemned except for a recognized public use. Gralapp v. MississippiPower Co., 280 Ala. 368, 194 So.2d 527 (1967). This "public use" requirement is also contained within Ala. Const. art. XII, § 235, which mandates that municipalities pay just compensation when exercising "the privilege of taking property for public use." Although we have not specifically ruled upon whether use of property for off-street public parking in urban areas is a "public use," other jurisdictions clearly recognize this use as being public. See, e.g., Miller v. City of Georgetown, 301 Ky. 241, 191 S.W.2d 403 (1945); Bowman v. Kansas City, 361 Mo. 14,233 S.W.2d 26 (1950). The Alabama legislature, moreover, has implicitly recognized that the use of property for off-street public parking in urban areas constitutes a public use in its declaration that providing off-street parking in urban areas is necessary to the health, safety and general welfare of the public. Act of October 1, 1971, No. 2079, § 1, 1971 Ala. Acts 3335. We therefore hold that the use of property for off-street public parking in urban areas is a "public use" which constitutes a purpose "for which property may be acquired by condemnation . . ." in accordance with Code 1975, § 11-47-170.
The Williamses argue, however, that because the term "acquire," found in a 1933 statute, was construed to relate to a transaction "by purchase or gift" but not to a transaction "by condemnation," we should likewise construe the present statutory language to preclude the authority to condemn. J.Blach Sons, Inc. v. Hawkins, 238 Ala. 172, 189 So. 726
(1939).
When the same words are used in different statutes relating to different subjects, the extent of the meaning of the words is not always the same. City of Mobile v. Harker, 204 Ala. 26,85 So. 425 (1920). The statute in the Blach opinion authorized municipalities to "acquire" property outside of the municipality for public utility rights-of-way. The policy considerations militating in favor of a strict construction of the Blach statute, which denied condemnatory powers to acquire property outside municipal boundaries, are not present here. In the first place, the Williams property is located within municipal boundaries and hence within the City's ostensible condemnatory powers. More importantly, the limitation of the term "acquire" to "by purchase or gift" would render the §11-47-171 term "acquire by purchase" redundant and the term "acquire by condemnation" oxymoronic. Because we cannot presume *Page 88 
that the legislature used language without any meaning or application, Robinson v. State, 361 So.2d 1113 (Ala.), onremand, 361 So.2d 1115 (Ala.Crim.App. 1978), we cannot adopt the Williamses' strict construction of the statutory term "acquire." The City therefore possessed the requisite statutory authority to condemn private property located within its borders for an off-street public parking facility.
 Whether the Proposed Parking Facility was a Public Use within the Meaning of § 235
Article XII, § 235, of the Alabama Constitution requires that a municipality taking property for a public use pay just compensation. This provision has been interpreted to provide that property may not be condemned except for a recognized public use. Gralapp v. Mississippi Power Co., 280 Ala. 368,194 So.2d 527 (1967). Although this Court now recognizes that condemnation for off-street public parking facilities is a public use, we must nevertheless determine as a matter of law whether the City's proposed use of the parking facility is indeed public.
The term "public use" should be given an elastic or liberal meaning when used in the context of eminent domain proceedings.Brammer v. Housing Authority of Birmingham District, 239 Ala. 280,195 So. 256 (1940). As a general rule, an acquisition which primarily benefits the public while incidentally benefiting a particular private sector is deemed condemnation for a public use:
 "In order to constitute public use, it is not necessary that the whole community or any large part of it should actually use or be benefited by a contemplated improvement. Benefit to any considerable number is sufficient.
". . . .
 "Nor does the mere fact that the advantage of a public improvement also inures to a particular individual or group of individuals deprive it of its public character."
Kansas City v. Liebi, 298 Mo. 569, 593, 252 S.W. 404, 407
(1923) (citations omitted). Furthermore, where the legislature has declared a use or purpose to be a public one, its judgment should be respected by the courts. Alabama Power Co. v. GulfPower Co., 283 F. 606 (M.D.Ala. 1922). This deference also extends to municipalities enacting ordinances pursuant to this legislation. See Berry v. Alabama Power Co., 257 Ala. 654, 657,60 So.2d 681, 683 (1952).
Applying these principles to the facts surrounding the City's proposed parking facility, we find sufficient evidence to sustain the probate judge's finding that the proposed use was public, thereby warranting condemnation of the Williams property. In particular, the facts militating in favor of the public nature of the City's proposed use of the parking facility include the following uncontroverted facts: 1) that the resolution to condemn the Williams property explicitly defined the parking facility to be constructed on the condemned property as being "public"; 2) that the central business district of downtown Birmingham needed additional parking facilities and a parking survey recommended the construction of three downtown parking facilities to meet these needs; 3) that the City included spaces for 630 cars, far in excess of the 350 spaces requested by the adjacent private developer; 4) that no contracts to include any commercial space within the parking facility were in existence; 5) that no contracts to lease the facility or its airspace to any private developers were in existence; and most importantly, 6) the fact that the parking facility will be open to the general public to serve the existing needs of the downtown business community of Birmingham.
Undoubtedly, commercial enterprises such as the office building to be constructed by Birmingham Associates adjacent to the proposed parking facility will derive benefit from operation of the facility. In particular, the City will reserve 30 of the 630 spaces for tenants of this office building, yet these spaces will be located on the Bank property immediately adjacent to the office *Page 89 
building. The remaining 600 spaces will be open to the public on a "first come-first serve" basis, and the tenants occupying the reserved spaces must pay the same price as the general public. This de minimis private benefit, however, is not sufficient to detract from the public purpose of the facility:
 "Once it is determined that the taking is for a public purpose the fact that private persons may receive benefit is not sufficient to take away from the enterprise the characteristics of a public purpose."
Redevelopment Agency of City and County of San Francisco v.Hayes, 122 Cal.App.2d 777, 804, 266 P.2d 105, 122, cert.denied, 348 U.S. 897, 75 S.Ct. 214, 99 L.Ed. 705 (1954).
Although the line of demarcation between public and private use is oftentimes difficult to discern, a survey of the cases addressing this issue reveals the predominance of public use in the face of coexisting private benefit. In Nicrosi v. City ofMontgomery, 406 So.2d 951 (Ala.Civ.App. 1981), the condemnation of property for drainage improvement was held to be a public use in spite of the fact that private real estate developers who stood to benefit from the condemnation would reimburse the City for the costs of condemnation:
 "That the expenses incident to condemnation and the award itself are to be paid by private parties is immaterial when the property thus being acquired by the City is to be used for a public benefit. . . ."
Id. at 952 (citations omitted).
Other jurisdictions have likewise upheld the condemnation of property for the construction of off-street public parking facilities in the face of seemingly discriminatory private benefit. In Bowman v. Kansas City, 361 Mo. 14, 233 S.W.2d 26,33 (1950), the condemnation of private property for use as an off-street public parking facility was upheld, despite the fact that the parking facility would be leased for private operation and would compete with other private facilities in the downtown retail district of Kansas City. In Barnes v. City of New Haven,140 Conn. 8, 98 A.2d 523 (1953), the Connecticut Supreme Court upheld its parking authority act:
 "Nor does the possibility that the act may prove of greater benefit to store owners in the shopping district than to some other residents of the city render it invalid as discriminatory, any more than would the outlay of public funds to pave a particular section of street, with its greatest benefit to the immediate abutters than to others. . . . Again, the leasing of a parking facility by the authority to another to operate would not be inconsistent with the public character of the facility, since the fact that such private lessee may gain thereby is merely incidental to the public purpose of operating it for the use of the public."
Id. at 18, 98 A.2d 529 (citation omitted). More recently inSeligsohn v. Philadelphia Parking Authority, 412 Pa. 372,194 A.2d 606 (1963), cert. denied, 376 U.S. 952, 84 S.Ct. 970,11 L.Ed.2d 971 (1964), the Pennsylvania Supreme Court concluded that a proposed parking facility was predominantly for public use although the proposed garage would be physically connected to two large private department stores in Philadelphia. In a later Pennsylvania decision, Campbell v. Bethlehem ParkingAuthority, 20 Pa. Commw. 445, 342 A.2d 114 (1975), the city made assurances to two private developers that adequate parking facilities would be available in the downtown business district. When a proposed parking facility was then located in close proximity to these developments, the court nevertheless upheld the public nature of the facility, which would serve not only the needs of the adjacent bank and shopping mall but also the needs of the entire central business district.
A comparison of these holdings to the case at bar reinforces the public nature of the City's proposed parking facility, for if condemnations were upheld as being predominantly for public use despite such private nexuses as reimbursement for condemnation costs by private developers, lease of facilities to private enterprise, and enclosed walkways from the parking facilities to private buildings, the City's proposed parking facility should be deemed for public use due to the absence of these private contacts. *Page 90 
The circuit court, however, found that the City's proposed parking facility was primarily for private use. The court cited as precedent for its holding the case of Baycol, Inc. v.Downtown Development Authority of the City of Fort Lauderdale,315 So.2d 451 (Fla. 1975). That decision is distinguishable from the case at bar. In Baycol, the development authority sought to condemn property to erect an off-street parking facility. The authority then planned to lease the airspace to private developers who would construct a shopping mall on top of the parking facility. It was an undisputed fact that but for the shopping mall, there would be no need for the parking facility. The public purpose was therefore deemed to be only incidental to a predominantly private one, and the condemnation was enjoined. In the case at bar, however, the City never resolved to lease the parking facility or its airspace to private developers. More importantly, the City's proposed parking facility will be constructed to serve existing needs of the entire central business district and will serve a public need even if, arguendo, no office building is constructed on the Molton Hotel site.
The circuit court's inquiry into the necessity of the proposed facility, its location, and the supposedly flawed survey methodology was inappropriate:
 "The general principle is well established that the delegation of the power of eminent domain to a grantee, without restriction, carries with it the power to locate the route, and its location or necessity will not be interfered with by the courts if it is made by the utility in good faith and is not capricious or wantonly injurious. . . .
 ". . . Necessity to condemn is a legislative question, not judicial. It is granted by statute to petitioner. . . . The province of the court is to see that the right is not abused. . . ."
Berry v. Alabama Power Co., 257 Ala. 654, 657, 60 So.2d 681,683 (1952). Because the legislature delegated to the City the power to condemn property for off-street public parking, the circuit court could not second-guess the City's decision to condemn, in the absence of clear evidence of capricious, arbitrary conduct on the part of the City. Alabama Elec.Co-op., Inc. v. Watson, 419 So.2d 1351 (Ala. 1982).
Where no contracts between the City and private developers were in existence and the condemnation resolution contained no mention of commercial leases, the circuit court could not buttress its findings of predominantly private use upon mere speculation and conjecture. Even if the City did lease a small portion of its floorspace to commercial interests customarily found in parking facilities, the private use and income therefrom would be so small as to be merely incidental to the public parking activity. Larsen v. City and County of SanFrancisco, 152 Cal.App.2d 355, 313 P.2d 959, 965 (1957).
We therefore find sufficient evidence to sustain the probate court's determination that the proposed parking facility was primarily for public use in accordance with § 235 of the Alabama Constitution.
Whether the City's Sale of the Molton Hotel Site to Birmingham Associates Constituted a Grant of Money in Violation of § 94
Article IV, § 94, of the Alabama Constitution, as amended by Amendment 112, prohibits municipalities from granting public money to any individual. The circuit court determined that the City's sale of the Molton Hotel site to Birmingham Associates was for less than its value and constituted a grant of money by the City in violation of § 94. The court then characterized the proposed parking deck as an integral part of the contract between the City and Birmingham Associates and found the condemnation to be violative of § 94 also.
A careful view of the record reveals the absence of any testimony as to the fair market value of the Molton Hotel site at the time of the sale to Birmingham Associates. Without this evidence, the circuit court could not determine whether the City actually sold the property for less than its market value. Even if testimony of fair market value is proffered below, this Court *Page 91 
is reluctant to evaluate the adequacy of consideration in a commercial contract:
 "When a contract of a public body is an ordinary commercial contract, with benefits flowing to both parties and a consideration on both sides, it is not a lending of credit by the public body."
Rogers v. City of Mobile, 277 Ala. 261, 278, 169 So.2d 282, 298
(1964).
The judgment of the circuit court vacating the order of the probate court is reversed and the cause remanded for further proceedings in the probate court.
REVERSED AND REMANDED.
TORBERT, C.J., and FAULKNER, JONES and ADAMS, JJ., concur.