Henry Wade Gober, pursuant to Ala. Code 1975, § 12-22-6, appeals from the order of the Circuit Court of Elmore County denying his petition for the writ of mandamus. In his petition for the writ of mandamus, Gober requested that the circuit court order the Elmore County probate judge to set aside his order granting Elmore County's application to condemn a portion of Gober's property; he based his petition on the grounds that the proposed condemnation was not authorized by Alabama law and that it violated the Alabama Constitution of 1901, Article I, §23, and Article IV, § 94, as amended by Amendment 112.
This controversy has its origin in two contemporary dilemmas facing the people of Alabama: a growing need for an improved and expanded transportation infrastructure and the ever-present lack of sufficient governmental funds to meet that need while at the same time meeting other public needs. In recent years, tremendous population growth in the Millbrook-Coosada area of Elmore County has created an urgent need for an additional bridge across the Alabama River in order to accommodate the thousands of persons from that area who daily commute to and from their work in the City of Montgomery; however, neither the State of Alabama nor Elmore County or Montgomery County currently has the financial resources needed to build such a bridge. In order to solve this seemingly intractable problem, the governing bodies of Elmore County and Montgomery County agreed to study the feasibility of permitting a private corporation to build the needed additional Alabama River bridge and *Page 432 
to operate it as a for-profit toll bridge. Eventually, Sea Star, Inc., an Alabama corporation, owned by Jim Allen, an Elmore County businessman already experienced in successfully operating toll bridges, was chosen to construct and operate the bridge.
The agreement entered into between Sea Star, Inc., Elmore County, and Montgomery County states that for its part Sea Star agreed as follows:
 "[Sea Star] agrees to construct and develop the New Bridge substantially in accordance with Alabama Department of Transportation specifications. . . .
". . . .
 "[Sea Star] hereby represents and warrants that it will provide all funding for the design and construction of the bridge and required roadway fill necessary for the construction of the New Bridge abutment and toll plaza. [Sea Star] further agrees to assume all maintenance for the items it constructs."
In exchange, Elmore County and Montgomery County agreed as follows:
 "[Montgomery County and Elmore County hereby agree] to design roadways, relocate utilities, acquire rights-of-way and construct all necessary Project roadways within [their respective jurisdictions. Montgomery County and Elmore County also agree] to maintain all Project roadways lying within [their] boundaries as public roads. . . .
 "[Montgomery County and Elmore County also agree] to use [their] powers of condemnation and/or eminent domain to acquire any parcels of real property for which a right-of-way cannot be negotiated by [Sea Star] and which are considered by the parties to be necessary for the construction of the Project and, with respect to the roadway necessary to construct and maintain the New Bridge, toll plaza and bridge abutment, and to assign permanent rights-of-way to [Sea Star] or its assigns with respect to such property.
". . . .
 "[Sea Star] or its affiliates and its assigns shall have perpetual right to collect tolls and determine toll fares for the New Bridge."
It is undisputed that with the exception of the Gober property all the rights-of-way necessary to complete the project were obtained without the necessity of resorting to involuntary condemnation. In fact, some landowners actually donated tracts of their land in support of the project. Furthermore, the record shows that the project has been approved by all necessary governmental authorities, including the Army Corps of Engineers. Gober owns the last needed tract of land on the Elmore County side of the Alabama River.[1]
Gober's appeal raises three issues, each of which will be considered in turn:
 I. Whether Elmore County's condemnation of Gober's land for the purpose of building the connecting road and bridge abutment for a privately owned and operated toll bridge which is intended for use by the public violates the constitutional restrictions placed on the exercise of the power of eminent domain by Article I, § 23, of the Alabama Constitution.
 II. Whether Elmore County's condemnation of Gober's land for the purpose of building the connecting road and bridge abutment for a privately owned and operated public toll bridge was statutorily authorized.
 III. Whether Elmore County's participation in the proposed toll bridge project impermissibly "lend[s] [the county's] credit, or . . . grant[s] public money or thing of value in aid of, or to any . . . corporation" in violation of Article IV, § 94, of the Alabama Constitution, as amended by Amendment 112.
 I.
The concept of respect for private property is part of the very fabric of a free and *Page 433 
democratic society. The importance of the right of private ownership of property is evident in the organic law of our nation and our state. See, e.g., Amendment V ("No person shallbe . . . deprived of life, liberty, or property, without due process of law") and Amendment XIV ("nor shall any statedeprive any person of life, liberty, or property, without due process of law"), Constitution of the United States. See also Article I, § 6 ("he shall not . . . be deprived of life, liberty, or property, except by due process of law"); and Article I, § 35 ("the sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property"), Constitution of Alabama of 1901
(emphasis added). The framers of both the Federal Constitution and the Alabama Constitution clearly sought to create a governmental system that not only respected, but also affirmatively protected, the property rights of individuals. See Magna, Inc. v. Catranis, 512 So.2d 912 (Ala. 1987).
Like most rights though, the right to private property is not limitless.[2] In one of Alabama's earliest eminent domain cases, Chief Justice Lipscomb wrote:
 "[T]here is no maxim sounder, or of more universal application, than 'that individual right must yield to the public good.' "
Aldridge v. Tuscumbia, C. D.R.R., 2 Stew. P. 199, 204 (Ala. 1832). In the United States, the law of eminent domain is the product of the perpetual struggle between the competing concepts of individual right and public good. In Article I, § 23, of the Alabama Constitution, an almost perfect balance between these oftentimes opposing interests was struck:
 "[T]he exercise of the right of eminent domain shall never be abridged nor so construed as to prevent the legislature from taking the property and franchises of incorporated companies, and subjecting them to public use in the same manner in which the property and franchises of individuals are taken and subjected; but private property shall not be taken for, or applied to public use, unless just compensation be first made therefor; nor shall private property be taken for private use, or for the use of corporations, other than municipal, without the consent of the owner; provided, however, the legislature may by law secure to persons or corporations the right of way over the lands of other persons or corporations, and by general laws provide for and regulate the exercise by persons and corporations of the rights herein reserved; but just compensation shall, in all cases, be first made to the owner; and, provided, that the right of eminent domain shall not be so construed as to allow taxation or forced subscription for the benefit of railroads or any other kind of corporations, other than municipal, or for the benefit of any individual or association."
The power of eminent domain does not originate in Article I, § 23. Instead, it is a power inherent in every sovereign state. Section 23 merely places certain limits on the exercise of the power of eminent domain. This Court stated in Steele v. CountyCommissioners, 83 Ala. 304, 305, 3 So. 761, 762 (1887):
 "The right of eminent domain antedates constitutions, and is an incident of sovereignty, inherent in, and belonging to every sovereign State. The only qualification of the [inherent] right is, that the use for which private property may be taken shall *Page 434 
be public. . . . The constitution [of our State] did not assume to confer the power of eminent domain, but, recognizing its existence, [further] limited its exercise by requiring that just compensation shall be made."[3]
In order for an exercise of eminent domain to be valid under § 23, two requirements must be met. See Johnston v. AlabamaPublic Service Commission, 287 Ala. 417, 419, 252 So.2d 75, 76
(1971). First, the property must be taken for a public use and, with one exception inapplicable here, it cannot be taken for the private use of individuals or corporations.[4] This first restriction is no more than a restatement of a requirement inherent in a sovereign's very right to exercise eminent domain. See Steele, 83 Ala. at 305, 3 So. at 762. Second, "just compensation [must be paid] for any private property taken."Johnston, 287 Ala. at 419, 252 So.2d at 76.[5]
The basis of Gober's claim that Elmore County's proposed condemnation of a portion of his property violates § 23 is his assertion that the taking is not for a public use. Gober asserts that Elmore County is seeking to impermissibly condemn his property for private use, because the county intends to allow Sea Star, a private corporation, to construct a bridge abutment for its privately owned and operated toll bridge on a portion of the condemned property and intends to use the rest of the condemned property to build a road connecting to Sea Star's toll bridge. Gober's assertion is incorrect.
It is well settled in Alabama that the determination of whether a use is public or private is dependent upon the nature of the use, not the manner in which the use is accomplished. See Columbus Waterworks Co. v. Long, 121 Ala. 245, 247-48,25 So. 702, 703 (1898):
 "It is not the instrumentality employed for operating the public use, but the use itself, that satisfies the constitution."
See also Parrish v. City of Bayou La Batre, 581 So.2d 1101
(Ala.Civ.App. 1990) (holding that an agreement to build a new sewer line entered into between the city and the corporations to be benefitted by the new sewer line did not constitute a private use even though the benefitted corporations agreed to finance and construct the line). In Aldridge, 2 Stew. P. at 203, this Court eloquently and succinctly defined a "public use," holding that "[w]hatever is beneficially employed for the community, is of public use." Furthermore, our case law establishes that: *Page 435 
 " 'Once it is determined that the taking is for a public purpose the fact that private persons may receive benefit is not sufficient to take away from the enterprise the characteristics of a public purpose.' "
Florence v. Williams, 439 So.2d 83, 89 (Ala. 1983) (quotingRedevelopment Agency of City County of San Francisco v.Hayes, 122 Cal.App.2d 777, 804, 266 P.2d 105, 122, cert.denied, 348 U.S. 897, 75 S.Ct. 214, 99 L.Ed. 705 (1954)).
Applying these principles to this case, we must conclude that the purpose for Elmore County's application to condemn the land in question is a public use, that use being the creation of an indisputably much needed alternative route between the Millbrook-Coosada area of Elmore County and the City of Montgomery. The fact that a privately owned and operated toll bridge will be part of that new public roadway does not change the nature of the use in question. Nor does the fact that Sea Star will be allowed to build a bridge abutment upon a portion of the condemned property change the nature of the taking from a public use to an impermissible private use. See Parrish v.City of Bayou La Batre, 581 So.2d 1101 (Ala.Civ.App. 1990); see also Blankenship v. City of Decatur, 269 Ala. 670,115 So.2d 459 (1959) (which went as far as to hold that the taking of the petitioner's land pursuant to an urban redevelopment plan that provided that the condemned property would be later resold to private individuals and corporations after it had been cleared of dilapidated buildings constituted a taking for a public use and therefore did not violate § 23).
Our conclusion is supported not only by the application of Alabama case law, but also by the leading treatise in this area of the law, Sackman and Rohan, Nichols' The Law of EminentDomain (3d ed. 1990):
 "A bridge which is to be an integral part of a public highway has been held to be as much for a public use as is the highway itself and the power of eminent domain may properly be exercised in its behalf. Approaches to the bridge are likewise proper objects for the exercise of the power.
 "The mere fact that use of the bridge is to be conditioned upon payment of tolls does not destroy its character as a public use."
§ 7.27, pp. 7-212 through 7-213.
 "It is well settled that the incidental benefit to the stockholders in the profits arising from tolls, fares and other charges does not render the taking for a private use, if the tolls, fares and charges are to be derived from serving the public."
Id. at § 7.08[1], p. 7-68. (Emphasis added.)
 II.
Gober also contends that there is no statutory authorization for Elmore County to condemn his land for the purpose of building a connecting road and bridge abutment for a privately owned and operated toll bridge that is intended for use by the public. However, Ala. Code 1975, § 11-80-1, provides:
 "Counties and municipal corporations may condemn lands for public building sites or additions thereto, or for enlargements of sites already owned, or for public roads or streets or alleys, or for material for the construction of public roads or streets or for any other public use."
(Emphasis added.)
Having determined in Part I of this opinion that Elmore County's condemnation of Gober's land was for a "public use," we find no merit in this contention.
 III.
Gober asserts that the agreement entered into by Sea Star, Inc., Elmore County, and Montgomery County violates Article IV, § 94, as amended by Amendment 112, of the Constitution ofAlabama of 1901 (hereinafter referred to as " § 94"). He contends that Elmore County is impermissibly "lend[ing] its credit, or . . . grant[ing] public money" (§ 94) to Sea Star. This contention is premised upon two arguments. First, Gober argues that Elmore County's grant of a right-of-way or easement over the property in question to allow Sea Star access to the bridge site and to allow Sea Star to build a bridge abutment on a portion of the condemned property violates § 94. Second, *Page 436 
Gober argues that the expenditure of public funds by both Elmore County and Montgomery County to build and maintain a roadway connecting to Sea Star's toll bridge furthers the interests of Sea Star and therefore violates § 94.
The pertinent portion of § 94 states:
 "The legislature shall not have power to authorize any county, city, town, or other subdivision of this state to lend its credit, or to grant public money or thing of value in aid of, or to any individual, association, or corporation whatsoever. . . ."
In Mobile Wrecker Owners Ass'n, Inc. v. City of Mobile,461 So.2d 1303, 1306 (Ala. 1984), this Court stated:
 "Section 94 'was designed to prevent the expenditure of public funds in aid of private individuals or corporations by reason of which a pecuniary liability, a debt of the municipality, is incurred.' (Citation omitted). Opinion of the Justices No. 215, 294 Ala. 555, 567, 319 So.2d 682, 694 (1975). There is no lending of credit by a public body when it enters into an ordinary commercial contract, with benefits flowing to both parties and a consideration on both sides. Ramer v. City of Hoover, 437 So.2d 455 (Ala. 1983); Rogers v. City of Mobile, 277 Ala. 261, 169 So.2d 282
(1964)."
The mere fact that a county enters into a mutually beneficial agreement with a private individual or corporation does not violate Article IV, § 94 of our constitution. To rule that it does would arbitrarily prevent cities and counties from attempting to find innovative solutions to the problems they face, by foreclosing any opportunity for cooperation between the public and private sectors for the public good. Recognizing that this result was not intended by the framers of our constitution, this Court has repeatedly stated:
 " 'When a contract of a public body is an ordinary commercial contract, with benefits flowing to both parties and a consideration on both sides, it is not a lending of credit by the public body.' "
Florence v. Williams, 439 So.2d 83, 91 (Ala. 1983) (quotingRogers v. City of Mobile, 277 Ala. 261, 278, 169 So.2d 282, 288
(1964)). All the benefits flowing to Sea Star arise from a mutually beneficial agreement between Sea Star and the counties. Under the contract, no governmental money at all will be spent in building the privately owned toll bridge.[6] Sea Star, for its part, has agreed not only to pay all the expenses necessary for the construction of the toll bridge and bridge abutments, but also to be responsible for all future maintenance costs associated with the toll bridge. In exchange, the counties have agreed to allow Sea Star an easement to build bridge abutments on a portion of the land in question and have agreed to grant Sea Star an easement or right-of-way across the condemned land in order to fulfill its contractual obligations.[7]
In considering, for purposes of § 94 analysis, the question whether "a contract of a public body is an ordinary commercial contract, with benefits flowing to both parties and a consideration on both sides," Florence v. Williams, 439 So.2d at 91, this Court will not "presume bad faith nor will we inquire into the adequacy of the consideration." Newberry v.City of Andalusia, 257 Ala. 49, 57 So.2d 629 (1952) (refusing to question the motives behind a contract, or the adequacy of the consideration of that contract, between the City of Andalusia and a private manufacturer in which the city agreed to lease a portion of its industrial park to the manufacturer on very favorable terms). We must *Page 437 
therefore conclude that the easement rights granted to Sea Star, Inc., pursuant to the agreement between Sea Star and the counties did not constitute an impermissible "lend[ing of Elmore County's] . . . credit, or . . . grant[ing] public money" to Sea Star (§ 94).
Gober's reliance upon Griffin v. Jeffers, 221 Ala. 649,130 So. 190 (1930), is misplaced. The facts underlying the present controversy are very different from the facts this Court faced in Griffin. The facts of that case are as follows:
 "This bill is filed by a resident taxpayer against the county of Etowah and its board of revenue, and seeks to enjoin performance by the county of a contract entered into by it, . . . by which the county engaged to lease and operate a toll bridge, for a term of thirty years, to be constructed by Kershaw or his assigns, across the Coosa river. . . .
". . . .
 "The averments of the bill show that the estimated cost of the bridge is $138,000, and by the contract . . . the county leases the bridge before it is constructed, and engages to operate it for a term of thirty years, paying, as a part of the annual rent therefor, $9,600 in monthly installments, this sum being referred to and treated in a subsequent stipulation of the contract as interest on the investment.
 "By another stipulation the county agrees to pay out of the proceeds of the tolls collected for the use of the bridge, an additional sum of $4,600 per annum as rent, with further provisions that, if the funds accruing from the tolls are not sufficient to pay said additional rent, the same shall be allowed to accumulate and draw 6 per cent. interest per annum.
 "By another stipulation in the contract the county agrees to pay as rent an additional amount equal to all taxes, state, county, municipal, school, or district, and to pay this on demand. The county also assumes the obligation to maintain and keep the bridge in repair, and to pay and hold the lessor harmless from all damage that may arise from the use of the bridge.
 "In addition . . ., the county agrees to keep the bridge insured and pay the premiums thereon, the insurance to be payable to the lessor or his assigns or mortgagees. . . .
 "As appears from the allegations of the bill and a copy of the contract, . . . it was clearly within the contemplation of the parties and their controlling purpose that the lease should be so assigned that the obligations and undertakings of the county would stand as security for money obtained to construct the bridge."
Griffin, 221 Ala. at 650, 130 So. at 190-91. Griffin does not stand for the proposition that all agreements between counties and private toll bridge operators violate § 94. Instead,Griffin merely holds that a county or municipality may not enter into a contract guaranteeing that the operation of a privately owned toll bridge will be profitable. While the contract in question in Griffin was, in the words of this Court, "clearly a loan of [Etowah County's] credit to aid [the toll bridge owner] and his associates to construct a privately owned toll bridge," Griffin, 221 Ala. at 651, 130 So. at 192, the agreement in question in this case clearly is not.
Gober's second argument is premised upon his contention that Elmore County and Montgomery County have entered into an agreement with the intention of spending millions of dollars to build roads connecting with Sea Star's toll bridge, with the primary object being to benefit Sea Star. If this allegation were correct, there could be a potential violation of § 94. Elmore County and Montgomery County are not building roads with the primary intention of benefiting Sea Star, Inc. Instead, they are building, for the benefit of the commuting public, a roadway between the Millbrook-Coosada area and the City of Montgomery that happens to have a private toll bridge as a part of it. The fact that Sea Star is incidentally benefiting from the counties' efforts to satisfy a public necessity does not violate § 94.
For the foregoing reasons, the Elmore Circuit Court's order denying Henry Wade Gober's petition for a writ of mandamus is due to be affirmed.
AFFIRMED. *Page 438 
HOOPER, C.J., and MADDOX, SHORES, KENNEDY, INGRAM, and BUTTS, JJ., concur.
[1] Almost all of the Gober property that Elmore County seeks to condemn will be used to complete the last leg of the county road connecting Millbrook with the new bridge. The record does show that the last 30 to 40 feet of the tract leading to the edge of the Alabama River will be used to construct the bridge abutment for the toll bridge. Title to the entire tract, including the land on which the bridge abutment is to be built, however, will remain with Elmore County.
[2] In Aldridge v. Tuscumbia, C. D.R.R., 2 Stew. P. 199, 204 (Ala. 1832), this Court observed:
 "The sovereign authority is frequently exerted over personal rights and private property. It is done in the enforcement of all quarantine regulations — for the prevention of monopolies; and it is necessary, to prevent a correspondence with the public enemy. It is exercised by governments, as well in peace, as amidst the tumult of war — in time of peace, in opening harbors, dock yards, and channels of peaceful commerce, productive of the general prosperity of the country — in time of war, private property is more frequently subjected to the public use — for provisioning armies, supplying the means of transportation, and in the erection of fortifications. And, sometimes, it has been considered necessary to destroy every article of subsistance [sic], and every thing that could, in any way, be subservient to the support and comfort of an invading army, for the purpose of arresting its progress. In such cases, infinite distress is produced by the destruction of private property; but the government acts on the principle of a right to sacrifice a part of the good of the many."
[3] This Court in Steele interpreted and applied Article I, § 24, of the 1875 Constitution of Alabama, the language of which is identical to Article I, § 23, of Alabama's current 1901 constitution.
[4] Unlike a partnership, "[a] corporation can be created only by or under authority from the state." William L. Clark, Jr., Clark onCorporations, 2d ed., p. 10 (1907). Because of this, the framers of the Constitution of Alabama of 1875 considered corporations to be quasi-governmental entities, rather than strictly private entities. This confusion over the legal nature of corporations caused the drafters of § 24 of the 1875 Constitution (which is identical to § 23 of the Constitution of Alabama of 1901) to add the following language to the beginning of the eminent domain provision found in the Constitution of Alabama of1868:
 "[T]he exercise of the right of eminent domain shall never be abridged nor so construed as to prevent the legislature from taking the property and franchises of incorporated companies, and subjecting them to public use in the same manner in which the property and franchises of individuals are taken and subjected. . . ." The phrase in question in the present appeal — "nor shall private property be taken for private use, or for the use of corporations, other than municipal, without the consent of the owner" — reflects this same confusion as to the legal nature of corporations. In order to make it perfectly clear that private use by a corporation is to be considered "private use" within the meaning of § 24, the drafters of the 1875 constitution included the "for the use of corporations" language in § 24. That language did not, as the appellant argues, create a third restriction on the exercise of the power of eminent domain.
[5] Before the establishment of the post-Revolutionary War governments of the various United States, just compensation for property taken pursuant to the power of eminent domain had never been constitutionally guaranteed. In Aldridge v.Tuscumbia, C. D.R.R., 2 Stew. P. 199, 205 (Ala. 1832), this Court stated:
 "The sovereign power with us, has imposed a limitation on itself, unknown to other sovereignties, except those of the American Union. It is declared [in Alabama's original 1819 Constitution], that, this right of using private property for public use, shall not be exercised, 'without a just and fair compensation;'. . . ."
[6] If the counties were financing the construction of the toll bridge, the project's constitutional validity would be in question. See Opinion of the Justices No. 215, 294 Ala. 555,567, 319 So.2d 682, 694 (1975), in which this Court held that a bill that allowed municipalities to enter into joint projects with private electrical companies did not violate Article IV, § 94, of our constitution. In that opinion we stated:
 "The bill specifically provides for the cost of such Projects to be financed solely out of revenues derived from the Projects. No part of the Project costs are to be a charge on the general credit or tax revenues of any municipality. For these reasons § 94 is not violated."
Id. (citing Newberry v. City of Andalusia, 257 Ala. 49,57 So.2d 629 (1952)).
[7] The right-of-way granted to Sea Star is not exclusive. The roads built will be public roads. Arguably, it was not necessary for Sea Star to be given a right-of-way at all.